**UNITED STATES of America,**
Appellee,

v.

**Frank BORELLI,** Dominick Castiglia, **Benedetto Cinquegrano, Thomas Garibaldi, Carmine Locascio, Angelo Loiacano, Rosario Mogavero, Mike Sedotto, David "Pop" Smith, Rocco Sancinella and Harry Tantillo,** Appellants.

No. 478, Docket 28721.

United States Court of Appeals Second Circuit.

Argued June 11, 1964.

Decided July 31, 1964.

Manuel Katz, Boston, Mass. (Paul T. Smith, Boston, Mass., on the brief), for appellant Frank Borelli.

Jerome J. Londin, New York City, for appellant Michael Sedotto.

Ernst H. Rosenberger, Port Chester, N. Y. and Eve M. Preminger, New York City,, for appellant Angelo Loiacano.

Jacob W. Heller, New York City (Heller & Dretzin), New York City (Moses L. Kove, New York City, and Eugene L. Wishod, Smithtown, N. Y., of counsel), for appellant Benedetto Cinquegrano.

Harvey P. Dale, New York City (Anthony F. Marra, New York City), for appellant Rocco Sancinella

Jerome Lewis, Brooklyn, N. Y., for appellants David Smith, Thomas Garibaldi and Dominick Castiglia.

Alfred Donati, Jr., New York City, for appellant Rosario Mogavero.

Albert J. Krieger, New York City, for appellants Carmine Locascio and Harry Tantillo.

Peter Fleming, Jr., New York City (Robert M. Morgenthau, U. S. Atty., for the Southern District of New York; Charles A. Stillman, Robert J. Geniesse, Martin Gold, Edward M. Shaw and John Bartels, Asst. U. S. Attys., of counsel), for the United States.

Before FRIENDLY, SMITH and MARSHALL, Circuit Judges.

FRIENDLY, Circuit Judge:

Appellants from conspiracy convictions too often remind us of Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), and of Mr. Justice Jackson's concurrence in Krulewitch v. United States, 336 U.S. 440, 445, 69 S.Ct. 716, 93 L.Ed. 790 (1949), in instances where the reminder is inapposite. But a few facts will show in what degree the instant case gives point to Mr. Justice Jackson's description of conspiracy as "that elastic, sprawling and pervasive offense," whose development exemplifies, in Judge Cardozo's phrase, the "tendency of a principle to expand itself to the limit of its logic"—and perhaps beyond.

This indictment was filed August 15, 1962. The applicable statute of limitations is five years, 18 U.S.C. § 3282. The conspiracy is alleged to have begun in 1950 and to have lasted until 1959. The only acts of participation proved as to one appellant were in 1951. As to others there was no evidence of participation later than 1955. Two who first appear in 1958 were found to have been in "partnership in crime," Pinkerton v. United States, 328 U.S. 640, 644, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), with those who, so far as the proof shows, left the stage seven and three years before. Tacitly recognizing inclusion of all the appellants

in a single conspiracy to be something of a *tour de force*, the Government contends in its able brief and argument that the convictions are buttressed by impressive authority and impeccable logic. The conspiracy, it says, was continuous as regards at least some of the principals; each participant is presumed to have been responsible for all that would ever go on, or that ever had; and he could terminate this responsibility only by making a clean breast to the authorities or by informing his colleagues—mostly unknown to him— that he was through. The appeal thus demands an examination of the application of the law of conspiracy to the long continued conduct of an illicit business. We have concluded that the case required a more carefully defined submission to the jury than the Government sought and obtained. For this and other reasons discussed below we reverse the convictions and direct a new trial.

I. *The Government's Evidence*

The burden of the Government's case was borne by Salvatore Rinaldo, also its principal witness in United States v. Agueci, 310 F.2d 817 (2 Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963). His testimony can be summarized as follows, postponing a few matters that will be mentioned where appropriate, and eliminating many details which are not here essential as they relate primarily to members of the conspiracy not involved in this appeal.

In the summer of 1950, Rinaldo met with Rosario and Joe Mogavero and Carmine Locascio, who wished him to travel to Italy to bring back "some junk." The trip was made around the turn of the year; Rinaldo paid $50,000 for the heroin. Rosario and Locascio then hired him to make deliveries, at a fee of $100 per package. Upon instructions from Rosario or Locascio, Rinaldo would pick up heroin at the "plant"—initially a machine shop, later Joe's home—and would make deliveries, typically of two or three kilos, to various wholesalers, including Tantillo, Cinquegrano and Borelli, who made their payments without using the

agency of Rinaldo. This activity continued for some time with minor variations not here material. In December, 1953, Rosario began serving an eight-year New York state sentence for extortion. At a farewell meeting he said that "in the future I [Rinaldo] was to take orders from Joe Mogavero and Carmine Locascio, and to act just like I had acted before; just that I would be taking orders from Joe Mogavero, but they would be just like coming from him."

Business continued much as theretofore. In June, 1954, Locascio introduced Rinaldo to one Jimmy Jerome, who later presented his runner, Mike Sedotto; Rinaldo began making deliveries to Sedotto. Another 1954 development was the deportation of Salvatore Caneba, the local representative of the Italian source of supply. In August, 1954, Locascio and Joe Mogavero introduced Rinaldo to a new connection, appellant David "Pop" Smith, from whom Rinaldo made large pick-ups, followed by deliveries, *inter alia*, to Borelli, Cinquegrano and Sedotto. The next year, 1955, saw the reestablishment of the Italian source of supply, although Smith also continued to be a provider.

Some of the heroin imported from Italy in the spring of 1955 proved to be impure; it would not dissolve or go through a needle. Sedotto returned a lot that he had picked up for Jerome. A second delivery from Italy in August 1955 was again a mixed batch—some of the heroin was pure, some not. Joe Mogavero and Locascio continued operations with the pure Italian heroin and with supplies obtained from Smith, but 42 kilograms of bad heroin became an albatross around the business' neck. Rinaldo made a trip to Italy to pay the Canebas a reduced price for the impure heroin. Their contention that they were entitled to $50,000 more than Rinaldo's principals were willing to pay led them to insist that any future dealings must be on a cash on delivery basis.

On Locascio's instructions, confirmed by Joe Mogavero, Rinaldo gave the former 20 kilograms of the impure heroin in May, 1956; Joe and Locascio had agreed to "try to get rid of the stuff separately * * * It was too much, anyway, to be keeping in one place." In the ensuing months Joe and Rinaldo labored mightily to purify the 22 kilos of impure heroin which Joe had kept. In June or July, 1957, Joe told Rinaldo he had spent between $100,000 and $150,000 of Rosario's money and wanted to get moving again. In September or October, he explained that he was negotiating with appellant Loiacano for the sale of the 22 kilos; he later confided that Rosario had instructed him not to be sticky about the price. In December, 1957, Joe introduced Rinaldo to Loiacano and the latter's runner, appellant Sancinella, and instructed that deliveries of the impure heroin were to be made to the latter. Rinaldo made about seven such deliveries, the last in March, 1958.

The next chapter began shortly thereafter. Around April, 1958, Joe Mogavero and Loiacano, now risen to partnership rank, told Rinaldo they would have to get a new source of supply; the contact was to be Charles Di Palermo, a name frequently encountered in cases of this sort, but the place of delivery was uncertain. About May or June, Rinaldo was introduced to appellant Garibaldi whom Joe and Loiacano presented as the "fellow who would pick up the goods that I was getting." In July, Rinaldo was told to go to Miami to take delivery of heroin that was being brought in by ship. Di Palermo was there and sold him seven kilos. Rinaldo returned to New York and delivered these to Garibaldi against payment of $35,000 in small bills, which he took to Joe and Loiacano. Later Rinaldo made pick-ups from a new source of supply, Freddy Eppolito; these also he delivered to Garibaldi. In September, while making further deliveries, Rinaldo complained to Garibaldi about receiving payment in small bills; the latter replied "that was the way he was getting the money from Borelli, and that's the way he was going to give it * * *" to Rinaldo. He also volunteered that it was he who

had purchased Locascio's share of the impure heroin.

The last appellant to appear is Castiglia. Described as "Mickey Blair", he was introduced by Joe Mogavero to Rinaldo in November, 1958, as one who in turn would introduce a future deliverer of heroin. On several occasions between December, 1958 and March, 1959, through Castiglia's intercession, Rinaldo took deliveries from one Ralph; he in turn delivered to Garibaldi or Castiglia. The relationship between Rinaldo and his associates terminated in March, 1959, in a quarrel about money. Rinaldo thought he was to be a partner in the operations begun in 1958. Joe repudiated the suggestion, saying he had "spent all the cash that belonged to his brother, Saro, and the only way he could get even is if I [Rinaldo] wanted to work at $200 a kilo * * *" On Rinaldo's questioning whether this harsh attitude to him had Rosario's sanction, Joe said he had talked to Rosario "about this, and his brother gave him the okay to do anything he wanted."

Although the Government supported Rinaldo's testimony with evidence confirming his comings and goings and showing the existence of a secret closet in Joe Mogavero's apartment, the only other directly inculpatory evidence was the testimony of Sierra, relating to Sedotto, and of Ager, relating to Smith. Sierra, who had been in prison since 1957 on a federal narcotics conviction, testified to purchases of heroin in 1955 and early 1956 from Jimmy Jerome, with the deliveries being made by Sedotto. Some of this heroin was impure; consequent unpleasantness led to an interruption of contacts. These were renewed in July and August, 1956, and then again in December, 1956, and

Sedotto engaged in several of them. The coincidence of dates and the impurity of part of the heroin afforded some basis for concluding that these deliveries were of heroin emanating from Joe Mogavero or Locascio. Ager, under indictment for a federal narcotics offense, testified that in May or June, 1954, at his father's instance, he received a "16 unit" suitcase from Charles Bourbonnais which he delivered to Smith, who later gave him bags of money. This process was frequently repeated through 1955 and 1956, with Smith making numerous payments of about $40,000 at the rate of $5,000 per unit. Late in 1956, Smith complained of the quality. This led to a gap, but there was another delivery in mid-1957, the last payment for which was made in February, 1958. Ager's deliveries to Smith synchronized with Smith's deliveries to Rinaldo, although apparently they were larger in amount and continued longer. The deliveries Rinaldo received of Smith were generally of sixteen kilograms.

## II. "Single" Conspiracy

The indictment alleged a single conspiracy, and the court instructed the jury that if it found "that the government has failed to prove the existence of one conspiracy, you must find the defendants not guilty" and that "proof of several separate and independent conspiracies involving various of the defendants * * * is not proof of the single conspiracy charged * * *" Appellants contend that the evidence showed several conspiracies and, in the alternative, that the judge's failure to furnish the jury with an intelligible criterion for determining the issue of the one versus the many constituted "plain error" correctible under F.R.Crim.Proc. 52(b).[1] The Government

---

1. The charge on the subject was as follows:

"In determining whether there was a single conspiracy, you may consider what the evidence shows as to changes of personnel and activity, but you may find a single conspiracy even though there were changes in personnel and activities, provided that you find that some of the con-

spirators continued throughout the life of the conspiracy and that the purposes of the conspiracy continued to be those charged in the indictment.

"But, on the other hand, if you find that one conspiracy terminated and another one was formed you may not find a single conspiracy, even though the purposes of both conspiracies were the

responds that the evidence warranted the jury's finding a single "chain" conspiracy as in United States v. Bruno, 105 F.2d 921 (2 Cir.), rev'd on other grounds, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257 (1939); United States v. Rich, 262 F.2d 415 (2 Cir. 1959); United States v. Stromberg, 268 F.2d 256 (2 Cir.), cert. denied, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed. 2d 102 (1959); United States v. Agueci, supra; and United States v. Bentvena, 319 F.2d 916 (2 Cir.), cert. denied [Ormento v. United States, Di Pietro v. United States, Fernandez v. United States, Panico v. United States, Galante v. United States, Loicano v. United States, Mancino v. United States, Sciremammano v. United States, Mirra v. United States], 375 U.S. 940, 84 S.Ct. 345, 346, 353, 355, 360, 11 L.Ed.2d 271, 272 (1963); rehearing denied, Fernandez v. United States, 375 U.S. 989, 84 S.Ct. 515, 11 L.Ed.2d 476; and that the instruction was sufficient, at least in the absence of a request containing a better one or a pertinent exception. In this case whether there was a single or several conspiracies was extraordinarily significant because, in addition to the questions with respect to the admission of declarations that are often presented, the issue bore importantly on the problem of the statute of limitations. Cf. Berger v. United States, 295 U.S. 78, 81–83, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); Blumenthal v. United States, 332 U.S. 539, 559–560, 68 S.Ct. 248, 92 L.Ed. 154 (1947); United States v. Agueci, supra, 310 F.2d at 827–828.

As applied to the long term operation of an illegal business, the common pictorial distinction between "chain" and "spoke" conspiracies can obscure as much as it clarifies. The chain metaphor is indeed apt in that the links of a narcotics conspiracy are inextricably related to one another, from grower, through exporter and importer, to wholesaler, middleman, and retailer, each depending for his own success on the performance of all the others. But this simple picture tends to obscure that the links at either end are likely to consist of a number of persons who may have no reason to know that others are performing a role similar to theirs—in other words the extreme links of a chain conspiracy may have elements of the spoke conspiracy.[2] Moreover, whatever the value of the chain concept where the problem is to trace a single operation from the start through its various phases to its successful conclusion, it becomes confusing when, over a long period of time, certain links continue to play the same role but with new counterparts, as where importers who regard their partnership as a single continuing one, having successfully distrib-

---

same and that some of the defendants were members of both."

The judge had previously charged:

"Now, a conspiracy once formed, ladies and gentlemen, is presumed to continue as to each alleged participant until either its object has been accomplished or there has been some affirmative act by that participant of termination or withdrawal."

2. Thus, in the oft-cited Bruno case, although it is clear enough that "*quoad* the smugglers, there was but one conspiracy, for it was of no moment to them whether the middlemen sold to one or more groups of retailers, provided they had a market somewhere," 105 F. 2d at 923, it is not so clear why the New York and Texas groups of retailers were not in a "spoke" relation with the smugglers and the middleman, so that there would be two conspiracies unless the evidence permitted the inference that each group of retailers must have known the operation to be so large as to require the other as an outlet. Cf. United States v. Stromberg, supra, 268 F.2d at 264, and see Wechsler, Jones and Korn, The Treatment of Inchoate Crimes in the Model Penal Code of the A. L. I.: Attempt, Solicitation, and Conspiracy, Part II, 61 Colum.L.Rev. 957, 981–84, 994 (1961); The Conspiracy Dilemma: Prosecution of Group Crime or Protection of Individual Defendants, 62 Harv. L.Rev. 276 (1948); Federal Treatment of Multiple Conspiracies, 57 Colum.L. Rev. 387 (1957). Whether such a variance would cause any prejudice is a wholly different matter.

384

uted one cargo through X distributing organization, turn, years later, to moving another cargo obtained from a different source through Y. Thus, however reasonable the so-called presumption of continuity may be as to all the participants of a conspiracy which intends a single act, such as the robbing of a bank, or even as to the core of a conspiracy to import and resell narcotics, its force is diminished as to the outer links—buyers indifferent to their sources of supply and turning from one source to another, and suppliers equally indifferent to the identity of their customers.

■ The basic difficulty arises in applying the seventeenth century notion of conspiracy, where the gravamen of the offense was the making of an *agreement* to commit a readily identifiable crime or series of crimes, such as murder or robbery, see Developments in the Law—Criminal Conspiracy, 72 Harv.L.Rev. 922, 923 (1959), to what in substance is the conduct of an illegal business over a period of years. There has been a tendency in such cases "to deal with the crime of conspiracy as though it were a group [of men] rather than an act" of agreement. See 72 Harv.L.Rev. at 934. Although it is usual and often necessary in conspiracy cases for the agreement to be proved by inference from acts, the gist of the offense remains the agreement, and it is therefore essential to determine what kind of agreement or understanding existed as to each defendant. It is a great deal harder to tell just *what* agreement can reasonably be inferred from the purchase, even the repeated purchase, of contraband, than from the furnishing of dynamite to prospective bank robbers or the exchange of worthless property for securities to be subsequently distributed. Purchase or sale of contraband may, of course, warrant the inference of an agreement going well beyond the partic-

ular transaction. A seller of narcotics in bulk surely knows that the purchasers will undertake to resell the goods over an uncertain period of time, and the circumstances may also warrant the inference that a supplier or a purchaser indicated a willingness to repeat. But a sale or a purchase scarcely constitutes a sufficient basis for inferring agreement to cooperate with the opposite parties for whatever period they continue to deal in this type of contraband, unless some such understanding is evidenced by other conduct which accompanies or supplements the transaction.

■ The view that if the evidence warrants the finding that some defendants were parties to a single agreement to sell contraband for a nine-year period, it necessarily does so as to every defendant who has conspired with them at any time for any purpose, is thus a considerable over-simplification. Rinaldo's testimony thoroughly warranted the finding of an agreement among himself, Joe and Rosario Mogavero beginning in 1950 and continuing through 1959. But it does not follow, for example, that his recital of two deliveries to Tantillo in March and July, 1951, on the instructions of Locascio in one instance, and of Rosario Mogavero in the other, would justify a finding that Tantillo had thereby made himself a part of whatever narcotics enterprises Locascio, the Mogaveros and their future partners might engage in for the rest of their lives, provided only that these were uninterrupted—a theorem that would lead to the inevitable but extraordinary conclusion that Tantillo's two purchases entered him into a "partnership in criminal purposes," United States v. Kissel, 218 U.S. 601, 608, 31 S. Ct. 124, 54 L.Ed. 1168 (1910), with Castiglia, who supplied a source to and took deliveries from an altered core seven years later, and *vice versa.*[3] We agree

3. The Government relies also on a chance meeting between Rinaldo and Tantillo in 1960, where, after some casual conversation, "Tantillo told me that he was sorry that he had to stop picking up from me; that although he was paying 11,000 a kilo for it, there was plenty of margin for him." The inference from this is not at all helpful to the Government; it shows that Tantillo, far from being indissolubly linked with the central core, was willingly buying from someone else.

with the Government that the evidence links Tantillo with central figures in the conspiracy sufficiently to render inapplicable our decisions in United States v. Koch, 2 Cir., 113 F.2d 982 (1940) or in United States v. Stromberg, supra, 268 F.2d at 267 [as to Snyder]. For reasons later stated, we agree also that Tantillo did not make out the affirmative defense of withdrawal as a matter of law. But before that issue is reached, the Government must present evidence justifying the jury in finding beyond a reasonable doubt that the particular agreement into which a defendant entered continued into the period not barred by limitation, Grunewald v. United States, 353 U.S. 391, 397, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), and the scope of his agreement must be determined individually from what was proved as to him. If, in Judge Learned Hand's well-known phrase, in order for a man to be held for joining others in a conspiracy, he "must in some sense promote their venture himself, make it his own," United States v. Falcone, 109 F.2d 579, 581 (2 Cir.), aff'd, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940), it becomes essential to determine just what he is promoting and making "his own."

■ The utmost time bounds of any conspiracy proved as to Tantillo was the liquidation of the partnership between the Mogavero brothers and Locascio by the disposal of the last of the impure heroin imported from the Caneba source in Italy; we see nothing in the mere fact of his purchases that would warrant an inference that he agreed to participate in the activity, begun nearly seven years later, in which Loiacano replaced Locascio as partner of one or both of the Mogaveros, and which depended on wholly new sources of supply. It is indecisive on this issue that there was no substantial time gap between the two phases of the venture and that the jury might permissibly consider there to have been a single continuing agreement as regards the Mogaveros, Loiacano and Rinaldo; the change in operations was

sufficient to spend any force remaining in the inference of agreement arising from Tantillo's purchases of long ago. Compare, in a different but relevant context, Maggio v. Zeitz, 333 U.S. 56, 66, 68 S.Ct. 401, 92 L.Ed. 476 (1948).

Tantillo was thus entitled to an instruction which would make his conviction depend on the jury's accepting Rinaldo's testimony that Joe Mogavero's share of the impure heroin divided by the partnership was not sold until after August 15, 1957. The jury's attention should then have been focussed on the extent of the agreement attributable to Tantillo on the basis of his two purchases. Specifically, the jury should have been asked to decide whether the evidence showed that Tantillo was associating himself with the continuing enterprise of importations from Italy being conducted by the Mogavero brothers and Locascio, carrying through the final disposition of the impure heroin, or only with a plot to move what had already been imported. "Nobody is liable in conspiracy except for the fair import of the concerted purpose or agreement as he understands it; if later comers change that, he is not liable for the change; his liability is limited to the common purposes while he remains in it." United States v. Peoni, 100 F.2d 401, 403 (2 Cir. 1938). Although this may further complicate the already complex charge in a narcotics conspiracy trial, a requirement necessary to protect a defendant from over-extension of a legal doctrine may not be dispensed with simply because it somewhat lessens the attractiveness of prosecuting for conspiracy rather than for substantive crimes. By no means every conspiracy trial will raise the problem here considered. Often the defendant's act will not have the ambiguity with respect to the inference of agreement that is inherent in the mere purchase, transportation or sale of contraband; even in cases where some ambiguity exists, the precise scope of his agreement would not always be sufficiently important that the judge would

be required to stress it in his charge; here, because of the problem of limitations, it could be critical.[4]

 What we have written with respect to Tantillo[5] applies, *mutatis mutandis*, to Locascio, Cinquegrano, Sedotto, Smith and Sancinella;[6] although these may have played more important roles than Tantillo—indeed in Locascio's case it is plain, if Rinaldo's testimony is believed, that his activity was central—we see *no evidence that would warrant a jury* in finding that they became parties to the activity that began in April, 1958. Although the evidence implicating Loiacano both in the earlier and in the later phase was such that we might well consider any error on the single conspiracy issue to have been harmless with respect to him, see United States v. Cohen, 145 F.2d 82, 88–89 (2 Cir. 1944), cert. denied, 323 U.S. 799, 800, 65 S.Ct. 553, 89 L.Ed. 637

(1945); United States v. Benjamin, 328 F.2d 854, 864 (2 Cir.), cert. denied, Howard v. United States, 84 S.Ct. 1631 (1964), it would be best to have the jury determine whether he became a party to both phases, since if it were not convinced of his participation in the second, any finding of guilt on the first must hinge, as it should be told, on accepting Rinaldo's testimony as to the continuation of the efforts to dispose of the bad heroin beyond August 15, 1957. Garibaldi's acts related to the second phase but his admission that he was the purchaser of Locascio's share of the bad heroin would permit a finding that he was also a party to the first; the instructions as to him should parallel those as to Loiacano. As to Rosario the evidence sufficed to show participation in a single continuing conspiracy with his brother Joe and Rinaldo; his position as banker and his farewell

4. We realize that in a case not involving a time bar, the scope of a defendant's agreement is often pertinent to the admissibility of implicating declarations by alleged co-conspirators and to the relevance of evidence of their acts. However, many, perhaps most, declarations concerning a defendant who was no longer participating in the conspiracy would be barred in any event by the requirement that these be in furtherance of the conspiracy and not be merely narrative. Van Riper v. United States, 13 F.2d 961, 967 (2 Cir.), cert. denied sub nom. Ackerson v. United States, 273 U.S. 702, 47 S.Ct. 102, 71 L.Ed. 848 (1926); United States v. Goodman, 129 F.2d 1009, 1013 (2 Cir. 1942); United States v. Annunziato, 293 F.2d 373, 380 (2 Cir.), cert. denied, 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed. 2d 134 (1961); to the extent they would not be, a defendant is entitled to the protection we have outlined. As to the relevance of evidence of acts of alleged co-conspirators outside the scope of a particular defendant's agreement, a general instruction will suffice, and we doubt that this will either be confusing to the jury or be nugatory—as witness the acquittal of five defendants here. In cases like this the existence of a conspiracy is not usually in serious question; the controverted issues are the various defendants' connections with it. The court always charges that this must be determined on an individual basis; we hold only that where the evidence is ambiguous as to

the scope of the agreement made by a particular defendant and the issue has practical importance, the court must appropriately focus the jury's attention on that issue rather than allow it to decide on an all-or-nothing basis as to all defendants.

5. Tantillo complains also that he was sentenced to 10 years for the offense of conspiracy added to 21 U.S.C. § 174 by the Act of November 2, 1951, 65 Stat. 767. Before that, 18 U.S.C. § 371, had made it a crime to conspire to violate 21 U.S.C. §§ 173–174, but the maximum imprisonment was five years. Unless the jury finds that Tantillo entered into and remained in a conspiracy continuing beyond November 2, 1951 to August 15, 1957, the statute of limitations will bar any punishment; if it does find that, the increased punishment is not *ex post facto*. United States v. Markman, 193 F.2d 574 (2 Cir.), cert. denied sub nom. Livolsi v. United States, 343 U.S. 979, 72 S.Ct. 1079, 96 L.Ed.2d 1371 (1952).

6. Sancinella's case illustrates how the determination of the scope of the agreement will often be relatively inconsequential. Even if his only agreement was to aid in the disposal of the impure heroin, this continued into the period not barred by limitations and the proof against him was Rinaldo's testimony as to his acts, not declarations of other persons about them.

address were sufficient evidence of his continuing participation to render admissible his brother's statement further implicating him in the second phase. There was no evidence connecting Castiglia with the activities prior to the resort to new sources of supply in April, 1958; the jury should have been instructed to disregard all evidence of these in determining his guilt.

■ This leaves Borelli. The only evidence expressly connecting him with the later phase consists of Garibaldi's declaration in September, 1958, that Borelli was then dealing with him; this was admissible against Borelli only if other evidence permitted the inference that he had associated himself with the continuing venture. See United States v. Reina, 242 F.2d 302, 306 (2 Cir.), cert. denied sub nom. Moccio v. United States, 354 U.S. 913, 77 S.Ct. 1294, 1 L.Ed. 2d 1427 (1957). Borelli had been one of the first purchasers, in May, 1951. From that time until late in 1955, deliveries to him were so frequent and so large as to suggest strongly that he was a continuing customer on whom Joe Mogavero could rely during the second phase of the conspiracy in which Garibaldi was a prominent figure. Although such evidence, standing alone, might not have sufficed to warrant submitting Borelli's participation in the second phase of the activity to the jury, the judge could properly deem it enough to meet the threshold requirement of showing the likelihood of an association between Borelli and Garibaldi and thus to render admissible the latter's statement confirming the association; with this added, the evidence of Borelli's participation in both phases of the conspiracy was sufficient for persuasion beyond a reasonable doubt. Cf. United States v. Pugliese, 153 F.2d 497, 500 (2 Cir. 1945); United States v. Dennis, 183 F.2d 201, 230–231 (2 Cir. 1950), aff'd, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951); Carbo v. United

States, 314 F.2d 718, 735–738 (9 Cir. 1963), cert. denied, 84 S.Ct. 1626 (1964); McCormick, Evidence, § 53 (1954); Maguire and Epstein, Preliminary Questions of Fact in Determining the Admissibility of Evidence, 40 Harv.L.Rev. 392, 415–18 (1927); Morgan, Functions of Judge and Jury in the Determination of Preliminary Questions of Fact, 43 Harv. L.Rev. 165, 169, 175, 188 (1929). Like Loiacano and Garibaldi, Borelli was entitled to an instruction that if the jury found the evidence insufficient to link him with the second phase, his liability to conviction depended on whether the efforts to dispose of the bad Italian heroin lasted beyond August 15, 1957.

■ We add a word why our conclusion on the single conspiracy issue does not require us to direct that any of the defendants be acquitted or even that on a retrial the Government elect between the first and the second phase of the conspiracy, as in United States v. Russano, 257 F.2d 712, 716 (2 Cir. 1958). In contrast to that case, the Government's evidence here was sufficient to permit a finding of a single continuing conspiracy by several defendants, Rosario Mogavero, Loiacano, Borelli and Garibaldi, along with Joe Mogavero and Rinaldo. It sufficed also to show that Locascio, Tantillo, Cinquegrano, Sedotto, Smith and Sancinella had joined with them in one phase of their criminal enterprise and Castiglia in another. This met the joinder requirements of F.R.Crim.Proc. 8, cf. A. L. I. Model Penal Code, § 5.03(4); such variance as there was from the indictment required only the giving of appropriate instructions. See Berger v. United States, 295 U.S. 78, 82–83, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); United States v. Cohen, supra, 145 F.2d 82, 88–89; United States v. Agueci, supra, 310 F.2d at 827–828.[7] The case thus is one of trial error, not of misjoinder or of failure of proof.

7. Our view that each defendant can be held only for an agreement reasonably inferable as to him reinforces the Government's already sufficient answer to Loiacano claim that his conviction in United States v. Bentvena, 319 F.2d 916

III. *Withdrawal*

Seven appellants, Tantillo, Sedotto, Borelli, Smith, Locascio, Rosario Mogavero, and Cinquegrano, contend that the evidence established as a matter of law that they withdrew from the conspiracy before August 15, 1957. The contentions of the first four rest primarily on the alleged absence of evidence of activity on their part after times prior to the cut-off date. Locascio relies on such absence of evidence and also on Rinaldo's testimony as to his split with the Mogaveros. The last two rely heavily on their incarceration—Rosario's, resulting from a state extortion conviction, beginning late in 1953, Cinquegrano's, for an unrelated federal narcotics offense, starting early in 1956, and both continuing beyond the critical date.

The Supreme Court last spoke comprehensively on withdrawal from a conspiracy in the opinion of Mr. Justice McKenna for five Justices in Hyde v. United States, 225 U.S. 347, 369, 32 S.Ct. 793, 803, 56 L.Ed. 1114 (1912)— the four dissenters not reaching this issue. It laid down rigorous requirements for making out the defense of withdrawal from a conspiracy "having continuity of purpose and which contemplated the performance of acts through a series of years. * * * Having joined in an unlawful scheme, having constituted agents for its performance, scheme and agency to be continuous until full fruition be secured, until he does some act to disavow or defeat the purpose he is in no situation to claim the delay of the law." Mere cessation of activity is not enough to start the running of the statute; there must also be affirmative action, either the making of a clean breast to the authorities, cf. Fiswick v. United States,

329 U.S. 211, 217, 67 S.Ct. 224, 91 L.Ed. 196 (1946), or communication of the abandonment in a manner reasonably calculated to reach co-conspirators. And the burden of establishing withdrawal lies on the defendant. See 72 Harv.L. Rev. at 958; Wechsler, Jones and Korn, supra, 61 Colum.L.Rev. at 1015–17; United States v. Cohen, supra, 145 F.2d at 90; United States v. Compagna, 146 F.2d 524, 527 (2 Cir. 1944), cert. denied, 324 U.S. 867–868, 65 S.Ct. 912, 89 L.Ed. 1422 (1945); United States v. Consolidated Laundries Corp., 291 F.2d 563, 573 (2 Cir. 1961).

It is argued that however well founded the Hyde rule was on its facts, where, as the Government urged in its brief to the Supreme Court [p. 75 ff.], the defendant Schneider's pre-limitation conduct, in procuring false and fictitious applications for school lands and otherwise, resulted in the passage of titles in the General Land Office within the period,[8] the requirement of showing affirmative action is too severe for cases where a defendant simply engaged in the supply, transportation, or purchase of contraband before the period of limitations and the only effects realistically continuing into the period were the profits the central core had realized and its hope of further assistance. We should be obliged to give most serious consideration to this argument if, as urged by the Government, mere proof of past dealings with the core sufficed to permit a jury to infer an agreement to participate in its continuing activities to the end of time. However, our conclusion, explained above, that so broad an inference is not allowable, deprives the argument of a good deal of its force. Since each defendant can be held only for that part of

(2 Cir.), cert. denied, Loiacano v. United States, 375 U.S. 940, 84 S.Ct. 353, 11 L.Ed.2d 272 (1963), clothes him with the defense of double jeopardy. See United States v. Aviles, 274 F.2d 179, 193 (2 Cir.), cert. denied, 362 U.S. 974, 982, 80 S.Ct. 1057, 4 L.Ed.2d 1009 (1960), further proceedings remanded on other grounds, Evola v. United States, 375 U.S. 32, 84 S.Ct. 24, 11 L.Ed.2d 106 (1963).

8. As was persuasively said in the Solicitor General's brief (p. 79), "When conspirators have set a dynamite machine with a timed fuse in position to blow up a building and go away and leave it to do its destructive work in due course of time, they are continuing in their purpose and are in the actual execution of that purpose every moment of time until the machine explodes."

the conspiracy which he understood and assented to, and since the statute will begin to run for him when his own agreement terminates, it is neither unfair nor unreasonable to require affirmative demonstration that he was abrogating it at an earlier date. We note that the A. L. I. Model Penal Code, which requires separate determination of the scope of the agreement made by each defendant, preserves substantially the traditional test as to withdrawal. See § 5.03(1), (2) and (7), especially (7) (c); Tent. Draft No. 10, pp. 104, 117–26, 153–55 (May, 1962); Wechsler, Jones and Korn, supra, 61 Colum.L.Rev. at 979–94, 1015–17. We thus overrule the contentions of Tantillo, Sedotto, Borelli and Smith, that they were entitled to acquittal, on the basis of withdrawal, as a matter of law. Indeed, so far as concerns the last three, we fail to see how the evidence raised any jury issue on withdrawal as a matter of fact; even if the rigors of the Hyde rule were to be somewhat relaxed, mere failure by the Government to prove that activity by a particular conspirator continued into the period of limitations would not inevitably require the court to have the jury consider the defense of withdrawal.[9] Tantillo's case is different; his later statement to Rinaldo, see fn. 3, which the Government placed in evidence, combined with the fact that only two instances of contact were shown, these occurring six years before the beginning of the statutory period, raised an issue for the jury whether he had not sufficiently manifested an intention to withdraw.

The evidence as to Locascio's split with the Mogaveros in 1956, although sufficient to present a jury issue as to withdrawal, was far from requiring acquittal as a matter of law. Rinaldo gave testimony as to activity by Locascio early in 1957, noted in the final paragraph of this opinion, which the jury would have had to consider on this issue. Moreover, a

finding that Locascio terminated all relations with his associates in 1956 would not demand an acquittal. We see no flaw in the Government's argument that such a dissolution of the 1950 partnership would not constitute an effective withdrawal so long as any of the contraband obtained during his participation was being sold. We do not have to go so far as Eldredge v. United States, 62 F.2d 449 (10 Cir. 1932), to reach that conclusion. The sale of all the heroin—the Mogaveros' share as well as Locascio's—was the very object of the conspiracy; mere bifurcation of the routes of disposal for the conspirators' mutual convenience does not bring the activity to an end for any of them. Locascio could therefore be convicted if the jury accepted Rinaldo's testimony that the Mogavero share was not liquidated until after August 15, 1957.

Turning to the two defendants who were incarcerated, we speedily dismiss Rosario Mogavero's claim to acquittal. Neither authority nor reason would suggest that imprisonment necessarily shows a withdrawal; indeed, we have recently held squarely to the contrary, United States v. Agueci, supra, 310 F.2d at 838–839. Although the evidence of Rosario's continued participation after his incarceration was less strong than as to Valachi's in Agueci, it was strong enough for the jury to find that, far from withdrawing, he continued to be a significant member of the conspiracy.

Cinquegrano cites a number of opinions with passages suggesting that although confinement of a defendant does not constitute withdrawal as a matter of law, it is sufficient unless the Government comes forward with evidence of continued participation. We find difficulty in reconciling such broad statements with what the Supreme Court said in Hyde; we see no basis for thinking that if in that case the defendant Schneider had been incarcerated for an unrelated

9. In fact there was such evidence as to Borelli, as we have held. The Government contends that Ager's testimony as to deliveries to Smith in mid-1957 and payments in 1958 showed activity by him within the statutory period, but we do not think these were sufficiently connected with the conspiracy so that evidence concerning them was admissible.

offense more than three years before the indictment, the Court would have ruled one whit differently. The expressions cited are an expectable judicial reaction to extravagant claims of prosecutors that a few acts of assistance by persons on the periphery warrant a jury's finding an agreement to participate forever in the activities of the central core; our approach to that claim permits the defense of withdrawal to be confined in a manner more consistent with reason and with the authorities earlier cited. Some of the opinions suggested this precise ground that the agreement of a particular defendant might not be co-terminous with the over-all conspiracy. Buhler v. United States, 33 F.2d 382, 385 (9 Cir. 1929) [not an arrest case]; Poliafico v. United States, 237 F.2d 97, 105–106 (6 Cir. 1956), cert. denied, 352 U.S. 1025, 77 S. Ct. 590, 1 L.Ed.2d 597 (1957). In Fiswick v. United States, supra, 329 U.S. at 217, 67 S.Ct. 224; Cleaver v. United States, 238 F.2d 766, 769 (10 Cir. 1956), and Gay v. United States, 322 F.2d 208 (10 Cir. 1963), the confessions of co-conspirators after arrest were ruled inadmissible since, far from furthering the purposes of the conspiracy, they frustrated it; such confessions, if complete, would be sufficient to make out a withdrawal. The declarations in United States v. Carminati, 247 F.2d 640, 645–646 (2 Cir.), cert. denied, 355 U.S. 883, 78 S.Ct. 150, 2 L.Ed.2d 113 (1957), also were merely narrative and therefore inadmissible. The "core" members of the conspiracy were incarcerated in United States v. Russano, 257 F.2d 712 (2 Cir. 1958); this was held to have brought the conspiracy to an end. In the cases not thus distinguishable, Sandez v. United States, 239 F.2d 239, 243 (9 Cir. 1956), rehearing denied, 245 F.2d 712 (1957), and United States v. Consoli-

dated Laundries Corp., supra, 291 F.2d at 573–574, as well as in Cleaver v. United States, supra, 238 F.2d at 769, and United States v. Carminati, supra, 247 F.2d 640, the defendant had been arrested for the very offense charged in the conspiracy indictment. Assuming without deciding that the unlikelihood of the other conspirators' relying for further aid on a person known to be confined for the very offense in which they were engaging makes such confinement a sufficient "affirmative act" to sustain the defense of withdrawal in the absence of countervailing evidence—and that a holding to that effect would be permissible under the Hyde opinion, this would not serve Cinquegrano who pleaded guilty to an unrelated narcotics offense—and we see no basis for going further. We therefore overrule Cinquegrano's claim that his 1956 incarceration entitled him to acquittal under the statute of limitations as a matter of law. Proof of his conviction was offered only to the court in a motion for acquittal; if on retrial Cinquegrano chooses to place the fact in evidence, this will raise a question for the jury on the issue of his withdrawal.

IV. *Rulings with Respect to Rinaldo's Prior Statements and to Grand Jury Testimony*

█ In addition to the reasons in Part II of this opinion, we would be required to reverse, at least as to certain appellants, because of rulings on two issues relating to Rinaldo's testimony.

Rinaldo had been taken into custody by the Westchester County police in 1960 and had made long statements, in question and answer form, in the presence of Federal narcotics agents, the transcript of which was made available to defense counsel.[10] During his cross-examination, in a number of instances where counsel

10. We see no reason why the tape recordings of the interview, insofar as these related to Rinaldo's direct testimony, should not have been played to defense counsel to permit them to make their own determinations of the accuracy of the transcript rather than having to rely on the judge's, although the failure to do

this was, in all likelihood, not prejudicial. Use of the tape recordings before the jury would have been a different matter, as to which the judge could well have required a preliminary showing of discrepancy. See United States v. McKeever, 271 F.2d 669, 676 (2 Cir. 1959).

considered the earlier statements more favorable, Rinaldo affirmed that in his prior answers, as well as in those at the trial, he was telling the truth.

When a witness thus affirms the truth of a prior statement, the earlier statement is to be considered "not only as bearing on the credibility of the witness but as affirmative evidence." Stewart v. Baltimore & Ohio R.R., 137 F.2d 527, 529 (2 Cir. 1943); the trier of the facts has "two conflicting statements * * * of equal force as evidence," Zimberg v. United States, 142 F.2d 132, 136 (1 Cir.), cert. denied, 323 U.S. 712, 65 S.Ct. 38, 89 L.Ed. 573 (1944). See also Harman v. United States, 199 F.2d 34, 36 (4 Cir. 1952); Finnegan v. United States, 204 F.2d 105, 115 (8 Cir.), cert. denied, 346 U.S. 821, 74 S.Ct. 36, 98 L. Ed. 347 (1953).[11] In the discussions of requests to charge, the judge indicated that, consistently with these authorities, he would allow the jury to consider Rinaldo's prior statements as being affirmative evidence and not merely as impeaching credibility. But we do not read the instruction given as carrying this out. Defense counsel, who did not regard it as having done so, took proper exception, but the judge declined to alter it. There is, indeed, a question whether this error alone would require reversal. The prior statements, relating to Rosario's continued participation after incarceration and to the definitiveness of Locascio's retirement in 1956, could well be viewed merely as quick characterizations and hence as not truly inconsistent with the trial testimony. Still a jury would not necessarily consider them in that light, and with the Government's case so dependent on Rinaldo's testimony, we could hardly be certain that the error might not have affected the two defendants primarily concerned.

Taking full advantage of the ruling, in Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), that an indictment may be based on hearsay, the Government did not bring Rinaldo before the grand jury but instead had Selvaggi, a federal narcotics agent, tell the story Rinaldo had told him. Called as a defense witness on some minor matters, Selvaggi admitted that "a certain portion of" Rinaldo's trial testimony was inconsistent with his narration of it to the grand jury. Defense counsel then joined in a motion that the court inspect the grand jury minutes to determine these inconsistencies and make the relevant minutes available. The judge declined to do this except for inconsistencies between Selvaggi's own grand jury and trial testimony.

If Rinaldo had testified before the grand jury, the defendants would have been entitled to have the judge inspect the minutes and turn over any parts useful for cross-examination. United States v. Zborowski, 271 F.2d 661, 665–668 (2 Cir. 1959); United States v. Hernandez, 282 F.2d 71 (2 Cir. 1960), on rehearing, 290 F.2d 86 (1961). The Government ought not be allowed, by having its principal witness speak to the grand jury through the voice of another, to deprive a defendant of this right to impeach by contradiction. It is true that inconsistencies found in the grand jury testimony of such a surrogate are less susceptible of effective use than if the witness himself had testified; when the witness is confronted with what appears to be an inconsistency, he may deny having made the contradictory statement to the agent and counsel's only recourse would be to call the agent and endeavor to have him prove the contrary. But this is not a sufficient reason for the court's refusing to open this avenue of impeachment;

11. This principle long antedates and is quite different from our decision in United States v. De Sisto, 329 F.2d 929 (2 Cir.), cert. denied, De Sisto v. United States, 84 S.Ct. 1885 (1964), that two kinds of prior statements by a witness under examination—testimony on a former trial and before a grand jury (together with identifications affirmed by such testimony)—may be considered as independent evidence even though the witness *repudiates* them at the trial.

whether it is worth pursuing will then be for counsel to decide. We have reviewed Selvaggi's grand jury testimony and have found some differences between what he said Rinaldo had said and what Rinaldo said at the trial; although these are hardly nation-shaking, we cannot say that none would be susceptible of effective use.[12]

### IV. *Other matters*

■ Although our direction of a new trial makes it unnecessary to consider many points dealing with matters not likely to recur, we wish to mention one of these because of the serious implications that it and incidents in other cases, cf. United States v. Gersh, 328 F.2d 460 (2 Cir.), cert. denied, Mugnola v. United States, 84 S.Ct. 1919 (1964), have for the administration of criminal justice under the jury system.

During the trial seven jurors received unsigned letters reading in substance:

"Find these guinea sons of bitches guilty. Don't let them get away with something they did a long time ago. Send them to jail now, all those Mafia bums."

Some of the jurors considered the notes as threats, with a meaning opposite to what they said. The incident received careful and sensitive attention from the judge, the alleged inadequacy of which we need not consider in view of our disposition of the case. But it demonstrates the need for precautions assuring that the addresses, and perhaps even the names, of jurors in cases such as this will be held in confidence; courts must protect the integrity of criminal trials against this kind of disruption, whether it emanated from defendants' enemies, from their friends, or from neither.

■ It remains to deal briefly with certain rulings on questions of evidence that may recur on a new trial.

Two of these related to the examination of Ager. The defense had questioned him as to a statement he had given to the Government, in which he minimized his acquaintance with Bourbonnais and denied making any deliveries; Ager said the prior statement was false, and the judge then declined to receive it. The judge should have permitted the written statement to be introduced as affecting Ager's credibility rather than to force the defense to rely for impeachment solely on Ager's fleeting oral admission that he had lied on the earlier questioning. 3 Wigmore, Evidence §§ 1017, 1037 (1940 ed.); but cf. McCormick, Evidence 68 (1954). Ager had referred to the suitcases as having "16 units"; he later amplified this to 16 kilograms. When pressed by the Government for further explanation, he said "it must have been narcotics." On this being ruled out, the prosecutor, over objection, was allowed to ask "Do you know now what was in those suitcases?", which elicited substantially the same answer as had been rightly stricken; the objection should have been sustained in the absence of a showing that Ager was giving "an impression derived from the *exercise of his own senses,* not from the reports of others," or from speculation based on the high price paid. 2 Wigmore, Evidence, § 657(a) (1940 ed.).

■ Complaint is made of the refusal to compel the Government to turn over certain material in its files relating to Sierra. As in the case of Rinaldo's interview, see fn. 10, we can see no reason why portions of the tape recording of Sierra's interview which related to his testimony should not have been made available to defense counsel to enable them to be satisfied, as the judge was, with respect to the accuracy of the transcripts. More important was the refusal to turn over Sierra's letter of August 29, 1960, offering his assistance to the Gov-

---

12. In contrast, the judge's refusal to inspect Rinaldo's grand jury testimony in United States v. Agueci was a proper exercise of discretion; Rinaldo's testimony in that trial was available, and there is nothing to suggest that his grand jury testimony concerned any facts relevant to this case.

ernment "providing we can come to some kind of an agreement" and that "some thing can be done for me," and soliciting "a talk as to whether some sort of arrangements can be made to benefit the U. S. Government and my self. I am sure everyone in question will be very satisfied." The Government says this was properly refused since it did not "relate" to the subject matter as to which the witness had testified, within the meaning of the Jencks Act, 18 U.S.C. § 3500, and that in any event the refusal was not prejudicial in view of rather similar statements in the transcript of Sierra's interview. We need not pass on the latter contention, but the former is surely erroneous. We can see no reason why a statement that would support impeachment for bias and interest does not "relate" to the witness' testimony as much as a statement permitting impeachment for faulty memory, Rosenberg v. United States, 360 U.S. 367, 370, 79 S. Ct. 1231, 3 L.Ed.2d 1304 (1959). If "relate" were to be limited to factual narratives, we should have to consider whether a letter merely proffering a witness' services in return for consideration was within the protection which the Jencks Act confers upon the Government; but we think the broader construction preferable and, indeed, necessary. See Palermo v. United States, 360 U.S. 343, 350, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959). We add our wonder at the Government's willingness, not unique to this case, to imperil convictions hoped to be obtained after immense effort, by cavilling over the delivery of such a paper, whose admission would not add appreciably to the strength of the defense but whose erroneous exclusion might lie just beyond an appellate court's power of rescue under the harmless error rule.

A few further matters in conclusion: We approve the admission of the declarations of one Renna, made in 1957 immediately after a meeting with Locascio which Rinaldo had arranged at Joe Mogavero's request, "that he [Renna] seemed to think that everything with the Canebas and Locascio was all right."

There was ample evidence that Renna, as the Canebas' messenger, had joined with Locascio and the Mogaveros in the "Italian" phase of the conspiracy which was still being wound up, and the remark, in its setting, could be construed as indicating there was some thought of reviving the partnership and the Italian source of supply. On the other hand, a statement by Renna, on a chance encounter with Rinaldo in April or May, 1959, that he thought the difficulties which Joe Mogavero and Locascio had had with the Canebas had been resolved, would better have been excluded, both because of the lack of evidence that any bond with Renna still existed and because this declaration, made after Rinaldo's severance with Joe Mogavero, appears to have been narrative only. The incident with respect to the use of a prior consistent statement by Rinaldo as to the date when he began deliveries to Sedotto will hardly recur in the same form; it suffices to note that this circuit has disapproved of rehabilitation in that manner. United States v. Sherman, 2 Cir., 171 F.2d 619, 621–622 (1948), cert. denied sub nom. Whelan v. United States, 337 U.S. 931, 69 S.Ct. 1484 (1949), but see Baber v. United States, 116 U.S.App.D.C. 358, 324 F.2d 390, 394 (1963), cert. denied, 376 U.S. 972, 84 S.Ct. 1139, 12 L.Ed.2d 86 (1964). The Government's bills of particulars should not have been sent to the jury in the absence of any request on its part; the accusation is that made in the indictment, and submission of bills of particulars, even if accompanied, as here, by instructions that they are not evidence, is likely to be confusing. Cf. Pipkin v. United States, 243 F.2d 491, 494 (5 Cir. 1957).

The Court is indebted to Jerome J. Londin, Ernest H. Rosenberger, Eve M. Preminger and Harvey P. Dale, Esqs., assigned counsel, for forceful presentations in behalf of the appellants whom they represent.

Reversed for a new trial as to all defendants in a manner consistent with this opinion.