UNITED STATES of America, Appellee,

v.

UNITED STATES GYPSUM COMPANY,
Appellant in 75–1836, et al.

Appeal of NATIONAL GYPSUM
COMPANY, in 75–1837.

Appeal of GEORGIA–PACIFIC
CORPORATION, in 75–1838.

Appeal of The CELOTEX CORPORA-
TION, in 75–1839.

Appeal of Colon BROWN, in 75–1840.

Appeal of J. P. NICELY, in 75–1841.

Appeal of Andrew J. WATT, in 75–1842.

Nos. 75–1836 to 75–1842.

United States Court of Appeals,
Third Circuit.

Argued June 21, 1976.

Decided Jan. 12, 1977.

As Amended Jan. 20, 1977.

John C. Fricano, Rodney O. Thorson, George Edelstein, L. John Schmoll, Jr., Michael A. Rosen, Peter A. Mullin, Dept. of Justice—Antitrust Div., Washington, D. C., for appellee.

Robert C. Keck, James G. Hiering, Valentine A. Weber, Jr., Keck, Cushman, Mahin & Cate, Chicago, Ill., Benjamin M. Quigg, Jr., Morgan, Lewis & Bockius, Philadelphia, Pa., for U. S. Gypsum Co.

H. Francis DeLone, Alfred W. Cortese, Jr., John F. Wilson, III, Dechert, Price & Rhoads, Philadelphia, Pa., for Nat. Gypsum Co.

Cloyd R. Mellott, William B. Mallin, Barton Z. Cowan, J. Gary Kosinski, D. Richard Funk, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for Georgia-Pacific Corp.

W. Donald McSweeney, William A. Montgomery, Joseph R. Lundy, Schiff, Hardin & Waite, Chicago, Ill., for The Celotex Corp.

Paul C. Warnke, Thomas Richard Spradlin, Clifford, Warnke, Glass, McIlwain & Finney, Washington, D. C., for Colon Brown and J. P. Nicely.

Fred H. Bartlit, Jr., Thomas A. Gottschalk, Jeffrey S. Davidson, Kirkland & Ellis, Chicago, Ill., for Andrew J. Watt.

Before ADAMS, HUNTER and WEIS, Circuit Judges.

JAMES HUNTER, III, Circuit Judge:

This is an appeal by United States Gypsum Company (USG), National Gypsum Company (National), Georgia-Pacific Corporation (G–P), The Celotex Corporation (Celotex), Andrew J. Watt, Colon Brown, and J. P. Nicely, defendants in a complex case under Section 1 of the Sherman Act, 15 U.S.C. § 1.[1] Each corporate defendant manufactures, sells, and distributes gypsum board products, which are widely used in the construction industry. Watt is Executive Vice President of USG. Brown is Chairman of National's Board of Directors, and Nicely recently retired as Vice President for Sales in National's Building Products Division.[2] For the reasons that follow, we reverse and remand.

## I.

Gypsum board is produced in standard sizes, of which $4' \times 8' \times \frac{1}{2}''$ is the most common. It consists of a layer of gypsum rock sandwiched between sheets of heavy paper. Since World War II, it has replaced gypsum plaster as the principal component of interior walls in all types of buildings.

The gypsum board industry is highly concentrated. Between 1960 and 1973, the number of producers varied from nine to fourteen, and the eight major producers accounted for more than ninety-four percent of national sales. The corporate appellants together account for more than seventy-five percent of national sales. There are no significant differences in quality or appearance among the standard types of board produced by the various manufacturers. Demand is determined by activity in the construction industry and is inelastic with respect to price. Because of the homogeneity of the different brands, a buyer's decision to purchase one particular brand is generally based on price. Price discounts and changes in credit terms are the most important form of competition in the industry.

Between 1965 and 1970, the Department of Justice conducted several investigations of possible antitrust violations in the gypsum board industry. In 1971, a grand jury inquiry commenced, and another twenty-eight months of investigation ensued. On December 27, 1973, an indictment was returned in the Western District of Pennsylvania. It named the appellants and nine other defendants[3] as participants in a conspiracy, starting before 1960 and lasting to the date of indictment, (1) to raise, fix, maintain, and stabilize the price of gypsum board; (2) to fix, maintain, and stabilize the terms and conditions of sale of gypsum board; and (3) to adopt and maintain uniform methods of packaging and handling, all in violation of Section 1 of the Sherman Act.

---

1. Section 1 reads in pertinent part as follows:
   Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . . .

2. Each of the corporate defendants received the maximum $50,000 fine. Brown also drew a $50,000 fine, as well as a six-month suspended sentence and three years probation. Watt received a $10,000 fine, a six-month suspended sentence, and one year probation. Nicely was fined $1,000 and received a six-month suspended sentence and one year probation. After the indictment in this case was handed up, § 1 was amended to provide for a maximum fine of $1,000,000 for corporate defendants and $100,-000 for other persons. 15 U.S.C. § 1 (1970), *as amended* (Supp. IV, 1974).

3. The other defendants were Graham J. Morgan, chairman of the board of USG; William H. Hunt, president of G–P; William D. Herbert, president of Celotex; Kaiser Gypsum Company; Claude E. Harper and Robert A. Costa, Kaiser's president and vice-president, respectively; The Flintkote Company; and George J. Pecaro and James D. Moran, Flintkote's chairman of the board and president, respectively. The indictment named as co-conspirators, but not as defendants, Johns-Manville Corporation; Fibreboard Corporation; and the Gypsum Association, the industry trade association.

All defendants moved for dismissal, alleging that unreasonable pre-indictment delay had worked a denial of their rights to due process of law as guaranteed by the fifth amendment to the United States Constitution. This motion was denied after a five-day evidentiary hearing. Subsequently, the nine defendants who are not parties to this appeal were convicted and sentenced on pleas of nolo contendere.[4] Trial of the remaining defendants began on March 3, 1975, and the jury brought in its verdict on July 15, 1975. The Government called thirty-five witnesses, appellants thirty. The trial record consists of more than 15,000 pages of transcript and some 6500 exhibits.

## II.

At the outset, we are met with appellants' contention that the due process clause of the fifth amendment requires dismissal of the indictment. They allege that the Government unduly delayed bringing the indictment and that this delay impaired appellants' ability to present a defense. We affirm the district court's refusal to dismiss the indictment.

In *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), the Supreme Court indicated that "the Due Process Clause of the Fifth Amendment would require dismissal of the Indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to appellee's rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." *Id.* at 324, 92 S.Ct. at 465. Because no prejudice was shown, however, the *Marion* Court upheld the indictment. Thus, there was no holding as to the specific requirements of a successful showing of prejudicial delay, and it was unclear whether both prejudice and governmental intent are necessary or whether prejudice alone would suffice. *See, e. g., United States v. Barket*, 530 F.2d 189, 194–195 & n.9 (8th

Cir.), *cert. denied*, 429 U.S. 917, 97 S.Ct. 308, 50 L.Ed.2d 282 (1976). We need not resolve this question, because we find neither undue delay nor substantial prejudice.

■ We consider first the alleged undue delay. Appellants' major argument is that the Government deliberately postponed empaneling the grand jury to await the outcome of a civil case, *Wall Products Co. v. National Gypsum Co.*, 326 F.Supp. 295 (N.D. Cal.1971), involving charges of the same conspiracy. After a lengthy evidentiary hearing, however, the court below found that the interval between the initial investigations of the gypsum board industry and the bringing of the indictment was not unreasonable in light of the extraordinary magnitude of the case and the frequent dead ends encountered by the investigators. *United States v. United States Gypsum Co.*, 383 F.Supp. 462, 464–70 (W.D.Pa.1974). As the district court noted, *id.* at 467, any delay in empaneling the grand jury resulted from the Government's reluctance to frame criminal charges against appellants before learning whether plaintiffs in a civil action could carry their burden of proof. The district court's findings are not clearly erroneous.

USG separately argues that the Government is collaterally estopped to deny intentional delay, relying on *United States v. United States Gypsum Co.*, Civil No. 71–2467 (N.D.Cal., filed Dec. 30, 1971). In that suit against six gypsum companies, the Government sought to recover damages accrued before the start of the normal four-year period, claiming that defendants' fraudulent concealment of their conspiracy had tolled the statute of limitations. The district court granted a motion for partial summary judgment, declaring that the Government did know, or should have known, of the alleged conspiracy prior to January 1, 1968. This finding, insists USG, estops the Government from denying delay in this case.

4. Kaiser and Flintkote each received the maximum $50,000 fine. Morgan (USG) received a $40,000 fine, a six-month suspended sentence and two years probation. Hunt (G–P) and Harper (Kaiser) each drew a $40,000 fine, a six-

month suspended sentence, and eighteen months probation. Herbert (Celotex), Costa (Kaiser), Pecaro (Flintkote), and Moran (Flintkote) each received a $20,000 fine, a thirty-day suspended sentence, and one year probation.

■ In *Scooper Dooper, Inc. v. Kraftco Corp.,* 494 F.2d 840, 844 (3d Cir. 1974), Judge Garth noted three requirements that must be satisfied before collateral estoppel will apply:

a) The issue decided in the prior litigation must be identical with the issue presented in the action in question;

b) The prior litigation must have resulted in a final judgent [sic] on the merits; and

c) The party against whom the estoppel is asserted must have been a party or in privity with a party, to the prior adjudication.

USG's claim does not satisfy the first requirement. Governmental knowledge sufficient to preclude reliance on the doctrine of fraudulent concealment in a *civil* case is not identical with the availability of evidence sufficient to support the decision to bring *criminal* charges against the same defendants. Proof of the existence of the former does not entail proof of the existence of the latter. Therefore, there can be no collateral estoppel.

■ Having found no undue delay, we note that, in any event, appellants have not met their burden of proving substantial prejudice. In *United States v. Dukow,* 453 F.2d 1328 (3d Cir.), *cert. denied,* 406 U.S. 945, 92 S.Ct. 2042, 32 L.Ed.2d 331 (1972), this court, following *Marion,* refused to order the dismissal of an indictment where no substantial prejudice was shown. *Accord, United States v. Benson,* 487 F.2d 978, 984–85 (3d Cir. 1973). In *Dukow,* Judge Adams held the deaths of two potential witnesses not prejudicial, because there had been neither an offer of the testimony they would have given nor any indication that they possessed unique knowledge of the transaction in question. *Dukow, supra,* 453 F.2d at 1330. Here, as in *Dukow,* appellants argue that potential witnesses died in the lengthy interval between initial investigation and trial, but there is no showing that the deceased would have proffered testimony not merely cumulative of the evidence already at appellants' disposal.

Of the thirty-six deceased potential witnesses listed, only three received particular attention from appellants. One was Melvin Quayle, who was depicted in other testimony as an emissary of the other alleged conspirators. Quayle's denial before the grand jury of this role was read at trial. Appellants do not suggest that he would have testified any differently had he lived.

Appellants also insist that Donald Miller, late merchandising manager of Celotex, "would have made an excellent witness for the defense." They vouchsafe no reason to believe, however, that Miller's testimony would have been significantly more exculpatory than that offered by other witnesses.

Finally, appellants single out a USG memorandum of June 6, 1961, as a document the Government was able to exploit because its author, B. J. Nabors, was dead. Appellants, though, were free to offer alternative explanations of the document's contents. Moreover, Nabors died in 1967, ten months before the date on which USG claims the Government should have known of the conspiracy and sought an indictment. Cases of this magnitude often last so long that documents are introduced when the authors are no longer available to dispel any inculpatory impressions the documents may create. To hold that this handicap, by itself, is a violation of due process would be to erect a practical barrier to suits of this sort.

Appellants argue that under *United States v. Barket, supra,* the Government bears the burden of proving that none of the unavailable witnesses possessed exculpatory evidence. We find this argument unpersuasive. *Barket* differs from the case *sub judice* in several important respects. First, the procedural posture of *Barket* was the reverse of that here: the district court had granted the motion to dismiss the indictment. Second, the *Barket* court expressed grave misgivings about the merits of the Government's case. Third, the Eighth Circuit found the Government guilty of culpable negligence in delaying Barket's indictment. Fourth, and most important, the *Barket* court explicitly found

that "Barket's ability to defend himself on the crucial issue" had "undoubtedly" been impaired. *Id.* at 193.

None of these conditions obtains in the case before us. Because the court below refused to dismiss the indictment, we can order it dismissed only if we hold the district court's findings clearly erroneous. We are unable to take the frankly skeptical view of the Government's case on the merits, adopted by the *Barket* court. As we have already noted, the Government did not cause any undue delay in this case. Most importantly, we do not find that appellants' ability to defend themselves was impaired. Because the *Barket* court explicitly reached the opposite conclusion, its statement concerning the burden of proof on the issue of missing witnesses' possession of exculpatory evidence was dictum.[5] And were the statement indeed necessary to the result in *Barket,* we would see no reason to depart from the clear teaching of *Dukow* and impose upon the Government the burden of proving that none of the unavailable witnesses possessed significant, exculpatory evidence. *See, e. g., United States v. McGough,* 510 F.2d 598, 604 (5th Cir. 1975).

## III.

Thorough scrutiny of the voluminous record and careful consideration of the many issues raised on appeal convinces us that reversal is required.

### A.

■ The Government's case on price fixing centered on a practice appellants call "verification." An officer of one gypsum board manufacturer would telephone a competing firm's officer to determine the price at which the competitor was offering gypsum board to a specific customer. The scope, purpose, and duration of this activity are sharply disputed by the parties. The Government contends that the purpose of verification was to enable competitors to stabilize prices and "police" agreed-upon increases, that the calls involved broad discussions of present and future pricing policies, that the appellants verified daily, and that they continued to do so until 1973. Appellants insist that the only purpose of the calls was to ensure compliance with the Robinson-Patman Act (discussed below), that the conversations were limited in scope and number, and that the practice had been discontinued, except for a few isolated, unauthorized calls, before the start of the applicable limitations period, December 27, 1968. There is evidence to support each claim of both sides.

Appellants contend, however, that the court below erred in instructing the jury on the legal status of the practice. Although appellants assert that the evidence demonstrated that the purpose of certification was to comply with the Robinson-Patman Act, the trial court instructed the jury that any purpose was irrelevant so long as the jury

---

**5.** In concluding that the Government bears the burden of proving that no unavailable witness would have offered significant, exculpatory evidence, the *Barket* court relied on *United States v. Norton,* 504 F.2d 342 (8th Cir. 1974), *cert. denied,* 419 U.S. 1113, 95 S.Ct. 790, 42 L.Ed.2d 811 (1975). Norton, however, involved an unusual situation. The Government intentionally delayed its arrest of Norton on drug charges so that its informant, a key witness, could remain undercover and gather evidence for other prosecutions. Before Norton's arrest, the informant was murdered. The Eighth Circuit held that the Government had to accept the risk that its conscious decision to delay Norton's prosecution might result in the unavailability of a witness necessary to guarantee Norton a fair trial. Therefore, the burden of showing the informant's lack of exculpatory evidence was placed on the Government. Norton, however, was held to have waived the right to argue that the delay had prejudiced his defense, because he had rejected the Government's offer of proof on the issue of the informant's probable testimony. *Id.* at 345.

Whatever the merits of the *Norton* holding in the context of informant cases, we do not believe that it should be extended beyond that special context. An informant in a drug case is a potential witness who may be presumed to possess unique knowledge about the transaction. *Rovario v. United States,* 353 U.S. 53, 64, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). No such special presumption attaches to the usual witnesses in other cases. *See United States v. Dukow,* 453 F.2d 1328, 1330 (3d Cir.), *cert. denied,* 406 U.S. 945, 92 S.Ct. 2042, 32 L.Ed.2d 331 (1972).

found that verification had a stabilizing effect on prices.[6] The refusal to instruct the jury about the relevance of purpose was, for the following reasons, reversible error.

Section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a),[7] prohibits sellers from discriminating in price between different purchasers of the same commodity. Section 2(b), 15 U.S.C. § 13(b),[8] permits a seller to rebut a prima facie case under 2(a) by "showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor." The Supreme Court has held that Section 2(b) places

> on the seller the burden of showing that the price was made in good faith to meet a competitor's. . . . [T]he statute at least requires the seller, who has knowingly discriminated in price, to show the existence of facts which would lead a reasonable and prudent person to believe

that the granting of a lower price would in fact meet the equally low price of a competitor.

*Federal Trade Commission v. A. E. Staley Mfg. Co.,* 324 U.S. 746, 759–60, 65 S.Ct. 971, 977, 89 L.Ed. 1338 (1945). This court declared in *Viviano Macaroni Co. v. Federal Trade Commission,* 411 F.2d 255, 259–60 (3d Cir. 1969), that the seller cannot meet this burden merely by accepting the purchaser's word with respect to competitor's offers; instead the seller must attempt to corroborate the report, as well as the reliability of the purchaser or other reporter.

Appellants claim that their verification practice was designed to comply with the dictates of *Staley* and *Viviano.* They assert that almost all discounting off list prices was not reflected in invoices, rendering that form of corroboration ineffective. In addition, they say, purchasers of the gypsum board were notoriously unreliable and often were discovered to have lied about a competitor's offer in order to "whipsaw" a price cut. There is evidence to support these

---

**6.** On this point, the court charged as follows:

> Secondly, you must determine whether the purpose for the exchange of competitive information between the Defendants and their alleged coconspirators was to insure a good faith meeting of competition, as a defense to the Robinson-Patman Act.
>
> If you decide that, if you decide this was merely done in a good faith effort to comply with the Robinson-Patman Act, then you could not consider verification, standing alone, as establishing an agreement to fix, raise, maintain, and stabilize prices as charged.
>
> However, *if you decide that the effect of these exchanges was to raise, fix, maintain, and stabilize the price of gypsum wallboard, then you may consider these exchanges as evidence of the mutual agreement or understanding alleged in the indictment to raise, fix, maintain and stabilize list prices.*

(Emphasis added).

**7.** Section 2(a) reads in pertinent part as follows:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United

States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . . .

**8.** Section 2(b) reads as follows:

> Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price or services or facilities furnished, the burden of rebutting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section, and unless justification shall be affirmatively shown, the Commission is authorized to issue an order terminating the discrimination: *Provided, however,* That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor.

assertions. Therefore, argue appellants, they had three choices: (1) offer the reduced price on the basis of the purchaser's unconfirmed report and risk Robinson-Patman liability; (2) forego the price cut and risk losing the sale; or (3) call the competitor, verify his offer, and establish a section 2(b) defense to any Robinson-Patman charge concerning the price cut.

The countervailing policies of section 1 of the Sherman Act, however, complicate appellants' exposition of the issue. The Supreme Court has dealt several times with the limits imposed by the Sherman Act on exchanges of information among competitors. In *American Column & Lumber Co. v. United States,* 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284 (1921), the Court held that section 1 of the Sherman Act condemned the exchange of specific price information with regard to specific customers, where the clear purpose was to stabilize prices. The Court reached the same result in *United States v. American Linseed Oil Co.,* 262 U.S. 371, 43 S.Ct. 607, 67 L.Ed. 1035 (1923). Then in 1925, two cases upheld the exchange of information among competitors. In *Maple Flooring Ass'n v. United States,* 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925), the Sherman Act was held to permit the exchange of average cost data relating only to closed transactions, despite an apparent stabilizing effect on price, where no intent to constrain individual competitive activity was found. And the Court in *Cement Manufacturers Protective Ass'n v. United States,* 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104, approved the exchange of specific price information concerning specific customers, despite possible effects on prices, where the purpose of the dissemination scheme was to prevent buyers from defrauding sellers.

The Supreme Court has drawn a narrow line in deciding the data dissemination cases under section 1 of the Sherman Act. The difficulty derives from the fact that in competitive markets, information exchanges promote competition, while in oligopolistic markets, they depress competition. *United States v. Container Corp. of America,* 393 U.S. 333, 342–43, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969) (Marshall, J., dissenting); P. Areeda, Antitrust Analysis 13–16 (1974). Thus, the Court has attempted to fashion rules that will reach the latter, yet not amount to broad proscriptions embracing the former.

In *Container, supra*—the most recent data dissemination case—the facts were similar to those presented in the case *sub judice.* Eighteen manufacturers of corrugated containers accounted for 90% of the shipments of such products from the southeastern United States. The industry exhibited excess capacity and a downward trend in prices, yet twenty-one new competitors entered the industry during the period covered by the complaint—a clear indication that prices were above competitive levels. Containers were produced to customer specifications, but were substantially identical regardless of manufacturer. With a few exceptions, no manufacturer could command a higher price than another. From 1955 to 1963, defendants exchanged with varying frequency the prices most recently quoted to specific customers. No Robinson-Patman defense was raised, however.

The Supreme Court, 6–3, found a combination or conspiracy proscribed by the Sherman Act. The freedom to supply information only if each defendant so chose was described merely as the freedom to withdraw from the agreement. From the concentrated nature of the industry, the majority concluded that the information exchanges must have set a floor under prices. The Court distinguished *Cement Manufacturers, supra,* by pointing out that *Container* revealed no "controlling circumstance, viz., that cement manufacturers . . . exchanged price information as a means of protecting their legal rights from fraudulent inducements . . . ." *Id.* at 335, 89 S.Ct. at 511.

Mr. Justice Fortas concurred, declaring that he did not understand the majority to have established a *per se* ban of such exchanges. Instead, he concluded that the record supported a finding that the data dissemination had in fact affected prices.

*Id.* at 338–40, 89 S.Ct. 510 (Fortas, J., concurring). Justice Marshall, joined by Justices Harlan and Stewart, dissented. He agreed that exchanges of price information were not illegal *per se,* but he disagreed with Justice Fortas' conclusion that the record showed any effect on prices. *Id.* at 340–47, 89 S.Ct. 510 (Marshall, J., dissenting).

■ Each of the *Container* opinions found an agreement in the reciprocal dissemination of price information. The discord arose over proof of the agreement's effect. None of the Justices concerned himself with the agreement's purpose. The Court's careful distinction of *Cement Manufacturers,* however, suggests that proof of an actual purpose is not irrelevant in all cases. Where the *information exchange oc*curs under a "controlling circumstance," such as the purpose of preventing fraud in *Cement Manufacturers,* the exchange can be upheld under the Sherman Act, despite a proven or presumed effect on price.[9]

The question before us is whether appellants' alleged desire to establish a defense, to price discrimination charges, of compliance with section 2(b) of the Robinson-Patman Act would create a similar "controlling circumstance" that would legitimate an agreement otherwise prohibited by section 1 of the Sherman Act. If it would, then the trial court's instruction was improper in permitting the jury to convict appellants merely by finding an effect on prices, with no consideration of purpose. The Government denies that compliance with section 2(b) amounts to a "controlling circumstance." *Container,* claims the Government, limited "controlling circumstances" to prevention of fraud.

We do not read that case so narrowly. If the *Container* Court had sought to restrict the exception to "prevention of fraud," it could have distinguished *Cement Manufacturers* by noting simply that the *Container* case did not involve an attempt to thwart fraudulent purchasing practices, as had *Cement Manufacturers.* Instead, the Court used that much broader term "controlling circumstance," one of which was the desire to prevent fraud present in the latter case. This suggests that there are "controlling circumstances" other than the one delineated in *Cement Manufacturers.*

Price verification, insist appellants, must be considered a controlling circumstance. They claim that otherwise the very activity dictated by the Robinson-Patman Act could be used as evidence of conspiracy to convict under the Sherman Act. This conflict between the two acts would leave them with

**9.** If purpose were always irrelevant, as Judge Weis's dissent declares, then the *Container* Court would effectively have overruled. *Cement Manufacturers. See The Supreme Court, 1968 Term,* 83 Harv.L.Rev. 7, 234–5 (1960). Yet the vitality of *Cement Manufacturers* has been reaffirmed by favorable citation in *Goldfarb v. Virginia State Bar Ass'n,* 421 U.S. 773, 781, 95 S.Ct. 2004, 44 L.Ed.2d 486, *reh. denied,* 423 U.S. 886, 92 S.Ct. 162, 46 L.Ed.2d 118 (1975), and *United States v. Citizens & Southern Nat'l Bank,* 422 U.S. 86, 113, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975). Those cases also cite Justice Fortas's *Container* concurrence, suggesting that *Container* did not establish a *per se* rule against information exchanges, but left some to qualify as legitimate under the Sherman Act.

Judge Weis's dissenting opinion also attempts to liken the factual setting in the case *sub judice* to that found violative of the Sherman Act in *Container.* The dissent notes that the district court in *Container* found that buyers "on occasion" furnished inaccurate information as to competing sellers' prices, *see*

*United States v. Container Corp. of America,* 273 F.Supp. 18, 28 (M.D.N.C.1967), and held that the desire to prevent fraud took the container manufacturers outside the Sherman Act ban.

All this is irrelevant to the case at hand. Here, fraud is not at issue. Indeed, the *Container* opinion makes it clear that mere bad faith bargaining does not amount to "fraud" in the *Cement Manufacturers* sense.

What appellants urge here, though, is not a desire simply to avert occasional bad faith bargaining, but to comply with the positive duties imposed by another statute, the Robinson-Patman Act. The Robinson-Patman defense was not raised by the *Container* defendants at trial and was argued to the Supreme Court merely as an afterthought. That Court did not deal with it.

The question before us, then, is not whether occasional, or even widespread, buyer prevarication justifies price information exchanges, but whether the commands of Robinson-Patman may sometimes do so, when accommodated to Sherman Act strictures.

their three unappealing alternatives: (1) forego the price cut and probably lose a sale; (2) cut the price and risk a Robinson-Patman charge, if the buyer was lying; or (3) verify the price and risk the Sherman Act charge involved here.

The Government replies that nothing in the Robinson-Patman Act condones discussions about prices among competitors, nor has any court ever required such discussions as a condition of establishing a section 2(b) defense. Section 2(b), says the Government, does not force appellants to verify. The Government poses its alternatives for the appellants: (1) refrain from cutting prices to the single buyer; (2) cut prices as to all buyers. In neither event will the seller break either antitrust law.

Even the Government concedes that this choice is "difficult." We fear that so limiting sellers' alternatives would discourage price competition in industries like gypsum board, where the fact that price cutting occurs off list prices and invoices makes corroboration of reported competitor's offers difficult or impossible. In such industries, the Government's alternatives would eliminate the section 2(b) defense. This, it seems to us, would be more likely to put a floor under prices than to induce wholesale cutting, since a firm in a concentrated industry would be unlikely to reduce prices across the board simply to close a single sale. Report of the Attorney General's National Committee to Study the Antitrust Laws 181 (1955). And it is through isolated price reductions that established price levels are eroded, precipitating widespread price cuts. P. Areeda, *supra,* at 231. The Government's position, then, could induce greater price rigidity.

Because the Government's resolution of the conflict between the Sherman and Robinson-Patman Acts would require us to read the Sherman Act as discouraging the very price competition it was designed to promote, we reject that resolution. Appellants, however, seek an accommodation of the two acts that would recognize any bona fide attempt to comply with section 2(b) of Robinson-Patman as a "controlling circumstance" for Sherman Act purposes. Anticompetitive dangers exist on this side, too. Such a resolution would countenance a broad range of data dissemination schemes and communications among competitors, which might provide camouflage for illegitimate agreements. With this problem in mind, we turn to the cases that have already addressed this issue.

Except for the court below, each court to consider the issue has agreed with appellants that the attempt to establish a 2(b) defense amounts to a "controlling circumstance" that shields those exchanging information from Sherman Act liability. The first and most apposite case involved a civil action alleging essentially the same conspiracy charged here. In *Wall Products Co. v. National Gypsum Co.,* 326 F.Supp. 295 (N.D. Cal.1971), the court found that manufacturers of gypsum board, because their products were homogeneous, deemed it essential to meet lower offers by competitors. Purchasers aggressively played one manufacturer against another, whipsawing a series of price cuts through the industry by falsely reporting lower offers. When purchasers told sellers' field representatives of competitors' lower offers, the representatives asked for invoices or other written corroboration, but these requests usually proved fruitless. In order to insulate themselves against possible Robinson-Patman liability, specific company officials were given authority to communicate with the competitor in question. This communication took place "[only] after exhausting other means of confirming the truth of such reported deviation." *Id.* at 309. Specific confirmation was obtained, and no reported offers were met unless verified. The *Wall Products* court held that this activity amounted to a "controlling circumstance" contemplated by *Container.* 326 F.Supp. at 312.

The three other cases that involved this issue shared similar facts. In each, a major oil company conferred with its competitors during a gasoline price war, in order to verify its competitors' prices before granting temporary allowances to its own local retailer. Although it is not made clear in

*Webster v. Sinclair Refining Co.,* 338 F.Supp. 248 (S.D.Ala.1971), whether the defendant communicated directly with competitors or merely observed publicly posted prices, the court must have thought that there was direct communication. It stated that obtaining information from competitors does not violate section 1 of the Sherman Act if the "controlling circumstance" of Robinson-Patman compliance is present, citing *Wall Products,* 338 F.Supp. 251–52.

In *Belliston v. Texaco, Inc.,* 455 F.2d 175 (10th Cir.), *cert. denied,* 408 U.S. 928, 92 S.Ct. 2494, 33 L.Ed.2d 341 (1972), the competitors exchanged price information that was also publicly available through trade journals and financial dailies. *Id.* at 181. The court cited *Wall Products,* however, for the broad proposition that price information exchanges for the purpose of establishing a Robinson-Patman defense amount to a "controlling circumstance." *Id.* at 182.

The third gasoline war case was *Gray v. Shell Oil Co.,* 469 F.2d 742, 746–47 (9th Cir. 1972), *cert. denied,* 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1973). There the court held that the jury had to decide whether the purpose of Shell's communications with its competitors was to comply with the Robinson-Patman Act. Because the jury had found that purpose, the court upheld a verdict of no liability, citing *Belliston, supra.*

First, it should be noted that the three gasoline war cases significantly expanded the *Wall Products* holding. None contained any suggestion that alternative means of corroboration, such as invoices or public trade papers, were unavailable, as they had been in *Wall Products.* Indeed, the *Belliston* court expressly found that they were available. None indicated that the gasoline retailers had achieved the same reputation for mendacity that the *Wall Products* court ascribed to wallboard buyers. The gasoline war cases, then, suggest that the category of price exchanges that qualify as "controlling circumstances" is quite broad. So free a license to exchange price information might undermine the *Container* holding.

Second, these cases diluted the pro-competitive strength of the Sherman Act in order to preserve the force of Robinson-Patman's requirement of solid corroboration. Yet *Automatic Canteen Co. v. Federal Trade Commission,* 346 U.S. 61, 73 S.Ct. 1017, 97 L.Ed. 1454 (1953), suggests that when policies of the Sherman and Robinson-Patman Acts conflict, it is the Robinson-Patman Act that should give way. In *Automatic Canteen,* a buyer was charged with violating section 2(f) [10] of the Robinson-Patman Act, which forbids inducement of a discriminatory price. The question before the Court was which party—the FTC or the defendant—had the burden of producing evidence on the issue of the seller's costs, information that might demonstrate that the varying prices were not in fact discriminatory. The Court refused to place the burden of discovering the seller's costs upon the buyer because, among other things, "it would almost inevitably require a degree of cooperation between buyer and seller, as against other buyers, that may offend other antitrust policies," *id.* at 69, 73 S.Ct. at 1022, that is, section 1 of the Sherman Act.

We are therefore reluctant to embrace the accommodation fashioned by the gasoline war cases, which seems to eviscerate the Sherman Act for the benefit of Robinson-Patman. The best way to resolve the dilemma framed by appellants in this case, in the light of *Automatic Canteen,* would be to ease their burden under Robinson-Patman, instead of facilitating evasions of the Sherman Act's procompetitive strictures as did the gasoline war cases. If Robinson-Patman is interpreted to permit a seller lacking other corroboration to cut his price without taking the ultimate corroborative step of verifying the purchaser's report with his competitor, then the Sherman Act

---

**10.** Section 2(f), 15 U.S.C. § 13(f), reads as follows:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section.

and *Container* retain more vigor. We think *Wall Products, Viviano,* and a recent case in the Sixth Circuit outline such a solution to appellants' alleged dilemma.

In *Kroger Co. v. Federal Trade Commission,* 438 F.2d 1372 (6th Cir.) *cert. denied,* 404 U.S. 871, 92 S.Ct. 59, 30 L.Ed.2d 115 (1971), the Sixth Circuit affirmed an FTC finding that Kroger had induced a discrimination in price, in violation of section 2(f) of the Robinson-Patman Act. In soliciting bids for sale of private label milk to its chain of grocery stores, Kroger falsely told Beatrice Foods that it had received a bid twenty percent off list price from another dairy. The FTC found that Beatrice attempted to corroborate Kroger's report, but did not contact its competitor directly. *Beatrice Foods Co.,* 76 F.T.C. 719, 809–11 (1969). Relying on Kroger's false report, Beatrice cut its price to Kroger. Both Beatrice and Kroger were charged with violating the Robinson-Patman Act. The FTC, however, held that Beatrice had established the "good faith meeting competition" defense under section 2(b). Despite this finding that the price was not illegal as to the seller, Kroger was held to have induced a discriminatory price. The FTC declared that Beatrice could not be held liable for the discriminatory effect of the price, because it had no reason to disbelieve Kroger. The Sixth Circuit affirmed the ruling that Kroger could nevertheless be held to have known that the price it induced was in fact discriminatory. *Kroger, supra,* 438 F.2d at 1376–77.

The *Kroger* case, when combined with the *Wall Products* decision and our *Viviano* holding, offers a solution to the quandary in which appellants claim to find themselves. *Kroger* indicates that sellers can establish a section 2(b) defense without taking the ultimate corroborative step of communicating directly with their competitors. It accomplishes this by holding the purchaser to a high standard of good faith bargaining under section 2(f). Thus, as long as the seller has taken all other reasonable steps in an attempt to corroborate his purchaser's report of lower offers, he need not fear Robinson-Patman liability, provided that—as in *Kroger*—he has no independent reason to doubt the purchaser's reliability.

*Viviano,* though, requires the seller to investigate that reliability. *Vivano, supra,* 411 F.2d at 259. This holding protects the integrity of the section 2(b) defense. If the seller could discriminate in price when he had good reason to believe that the buyer—even a buyer held to a high standard by *Kroger*—was lying about a competitor's supposedly lower offer, then the "good faith" requirement of section 2(b) would be rendered nugatory. Therefore, if previous experience or the investigation required by *Viviano* reveals that the purchaser cannot be trusted, as was the case in *Wall Products, supra,* 326 F.Supp. at 309, then, and only then, the seller may communicate with his competitor to test the buyer's veracity. The presence of this doubt as to the purchaser's truthfulness, combined with the seller's inability to corroborate the buyer's reports independently, creates the "controlling circumstance" that exempts price information exchanges from the Sherman Act ban, under *Container.* This is a narrow "controlling circumstance," not the broad one of the gasoline war cases.

There was some evidence of this narrow "controlling circumstance" in this case. Several witnesses testified that the purpose of the "verification" calls was to establish a Robinson-Patman defense and that their scope was confined by that purpose. There was also testimony concerning the unreliability of purchasers in the gypsum board market. Therefore, appellants were entitled to an instruction that their verification practice would not violate the Sherman Act if the jury found: (1) the appellants engaged in the practice solely to comply with the strictures of Robinson-Patman; (2) they had first resorted to all other reasonable means of corroboration, without success; (3) they had good, independent reason to doubt the buyers' truthfulness; and (4) their communication with competitors was strictly limited to the one price and one buyer at issue. Trial court charged instead that if the jury found that verification had

an effect on prices, they had to find guilt under the Sherman Act. Because this charge improperly ignored *Container's* exception for price information exchanges carried out under a "controlling circumstance," reversal is required.

### B.

Appellants also contend that, on the state of the evidence, they were entitled to a more precise charge on the purpose and scope of the conspiracy any particular defendant was alleged to have joined. The Government insists that the trial court's charge on this point was sufficient and that appellants waived their objections in any event. I agree with appellants that the court's charge was deficient. Finding no waiver, I would order reversal on this point.[11]

Over a period of five months, the Government introduced masses of evidence concerning a multitude of seemingly unrelated events and attempted to link them together to show a single, overall conspiracy to stabilize the prices and marketing conditions of gypsum wallboard. Most of this evidence dealt with actions prior to the start of the applicable limitations period. In these circumstances, it was necessary specifically to inform the jury that any particular defendant could be found guilty of conspiracy only if he understood that he had joined the

single, overall agreement charged in the indictment; participation in any of the subsidiary events was not enough. *United States v. Peoni*, 100 F.2d 401, 403 (2d Cir. 1938); *accord, United States v. Purin*, 486 F.2d 1363, 1369 (2d Cir. 1973), *cert. denied sub nom. Da Silva v. United States*, 416 U.S. 987, 94 S.Ct. 2392, 40 L.Ed.2d 764 (separate appeal), *cert. denied sub nom. Purin v. United States*, 417 U.S. 930, 94 S.Ct. 2640, 41 L.Ed.2d 233 (1974) (separate appeal). The great number of activities in evidence and the huge cast of characters involved made it essential to impress upon the jury that each defendant could be found guilty of the conspiracy charged only if that overall design was within his reasonable contemplation when he engaged in any of the isolated activities. Specifically, the jury should have been asked to decide whether a given defendant, by engaging in one or more of the apparently isolated events, was associating himself with the overall agreement charged in the indictment. *United States v. Borelli*, 336 F.2d 376, 385 (2d Cir. 1964), *citing Peoni, supra*, 100 F.2d at 403. This the trial court did not do.

Trial court did—as did the trial court in *Borelli, supra*—repeatedly instruct the jury that each defendant could be found guilty only if he knowingly joined the conspiracy charged and that guilt was to be determined on an individual basis.[12] But this

---

**11.** Neither Judge Adams nor Judge Weis agrees with this view.

**12.** Relevant portions of the charge are as follows:

> Now I want to charge you at this time that it is your duty to give separate consideration to the charges against each of the Defendants, whether they were a corporation or an individual. Each must be passed upon by you separately. You may find all the Defendants guilty. You may find all of the Defendants not guilty or you may find some guilty and some not guilty. This depends on the facts as you find them and the inferences which you deem appropriate to draw from those charges. . . .
>
> An individual's membership in a conspiracy must be established by evidence as to his own conduct, what he, himself, knowingly said or did. . . .

> Now, there has been an issue raised that, even if—and it is, of course, denied there ever was a conspiracy—but it is contended that, even if one did exist, the Defendants or certain of them ceased to participate in any conspiratorial activity prior to December 27, 1968, and, therefore, cannot be found guilty, because they were not members of any conspiracy within the Statute of Limitations.
>
> . . .
>
> Now, in any trial, such as this one, with several Defendants, there is danger that a Defendant will not be judged solely upon the evidence applicable to him. In this regard, you must consider the evidence as to each Defendant separately.
>
> You have two questions to determine: First, whether there was a conspiracy to the character alleged in the indictment; and, second, if so, which of the Defendants, if any or all, were knowing participants in it. This in-

left the jury—like the jury in *Borelli*—free to find that a defendant automatically associated himself with the overall conspiracy charged merely by participating in one or a few of the acts alleged to be individual elements of the grand design. In this sense, the findings of guilt may have been "all-or-none": once an overall conspiracy was found as to some defendants, all of the defendants could have been connected to the conspiracy by their involvement in one of the minor agreements allegedly part of it. The court failed to emphasize that joining a subsidiary agreement would not constitute guilt unless it was done with the intent to join the overall conspiracy. This "all-or-none" basis for determining guilt is what bothered the *Borelli* and *Peoni* courts.

The *Borelli* court described the problem:

The view that if the evidence warrants the finding that some defendants were parties to a single agreement to sell contraband for a nine-year period, it necessarily does so as to every defendant who has conspired with them at any time for any purpose, is thus a considerable oversimplification. Rinaldo's testimony thoroughly warranted the finding of an agreement among himself, Joe and Rosario Magavero beginning in 1950 and continuing through 1959. But it does not follow, for example, that his recital of two deliveries to Tantillo in March and July, 1951, on the instructions of Locascio in one instance, and of Rosario Mogavero in the other, would justify a finding that Tantillo had thereby made himself a part of whatever narcotics enterprises Locascio, the Mogaveros and their future partners might engage in for the rest of their lives, provided only that these were uninterrupted—a theorem that would lead to the inevitable but extraordinary conclusion that Tantillo's two purchases entered him into a "partnership in criminal purposes," *United States v. Kissel*, 218 U.S. 601, 608, 31 S.Ct. 124, 54 L.Ed. 1168 (1910), with Castiglia, who supplied a source to and took deliveries from an altered core seven years later, and *vice versa*.

*Borelli, supra*, 336 F.2d at 384. Appellants here raise a similar concern. For example, it does not follow that appellant Brown's participation in the allegedly conspiratorial 1965 industry-wide price increase and 1966 change in credit terms—the only actions with which any evidence connected him—means that he associated himself with an overall conspiracy to stabilize prices beginning before 1960 and lasting until 1973. Each of the other appellants was likewise connected by the evidence only to a few of the dozens of allegedly conspiratorial episodes that the Government sought to weave into one overriding agreement. Yet the jury was never told that participation in one episode, without more, was insufficient to prove association in the latter enterprise.

In view of the ambiguity surrounding the scope of any agreement joined by each of the defendants, the trial court should have given the charge they requested on this point.[13] Conspiracy is "an elastic, sprawl-

___

volves an examination of the evidence, separately, with respect to each Defendant.

Now, in this instance—in this case, two of the Defendants are represented by one attorney. You still must examine the evidence as to each of those independently and reach your conclusion based on that evidence independently. Each defendant has the right to have you consider the evidence from his point of view—that is, you are to consider whether or not the evidence shows him individually guilty or not, and, unless you are convinced beyond a reasonable doubt of the guilt of a Defendant, you must return a verdict of not guilty as to that individual. . . .

In addition, you would not be warranted in finding any individual Defendant guilty, un-less you find beyond a reasonable doubt that, knowing of the existence of the conspiracy, he took some action or authorized or directed the employment of one or more means and methods in furtherance of the conspiracy, as I explained to you earlier.

Thus, the trial court never explicitly told the jury that participation in one of the allegedly conspiratorial subsidiary events was insufficient, without more, to support a verdict of guilty.

**13.** The requested charge was as follows:

Because the gist of the offense charged is a continuing agreement to raise, fix, maintain and stabilize prices of gypsum products, *it is essential for you to determine what kind of agreement or understanding, if any, existed*

ing and pervasive offense." *Krulewitch v. United States*, 336 U.S. 440, 445, 69 S.Ct. 716, 719, 93 L.Ed. 790 (1949) (Jackson, J., concurring). Trial courts must take great pains to prevent the seine of a conspiracy charge from entangling a defendant only tangentially related to the agreement in question.

The Government's assertion that appellants waived any objection to the trial court's charge on this point is without merit. Defense counsel three times expressed their willingness to make a record by "particularizing" objections to each charge the trial court denied. On each occasion, the court observed that particular objections would consume too much time and that one blanket objection sufficed to make a record for all. Where the trial judge declares that he does not require further elucidation of the requests he has refused, there can be no waiver. *See Green v. Reading Co.*, 183 F.2d 716, 719 (3d Cir. 1950); 3 C. Wright, Federal Practice and Procedure § 842 (1969). Hence, the lack of a specific objection to the refusal to give this specific charge does not bar appellants from raising it as error on appeal.

Contrary to the Government's claim, appellants submitted their requested charge in a timely manner. After telling counsel on June 27, 1975, what the substance of his charge would be, the trial judge invited written objections by July 2. On June 30, the court advanced that deadline one day, so that he could rule on the objections before closing arguments began. On July 1, appellants filed numerous objections and supplemental requests designed to meet the court's previous comments. Among them was the charge at issue here. Because of time constraints, the trial court did not then rule on the lengthy submissions. He indicated, however, that he would refer to them in formulating his charge.[14] Because the court acknowledged on the record that appellants had timely called his attention to the points they wanted charged, the Government's assertion of waiver must fail.

## C.

Appellants also question the sufficiency of the trial court's charge with respect to withdrawal from the alleged conspiracy. Where a continuing conspiracy is proven, each defendant who by affirmative action has completely disassociated himself from the agreement before the start of the limitations period is entitled to acquittal. *Hyde v. United States*, 225 U.S. 347, 369, 32 S.Ct. 793, 56 L.Ed. 1114 (1911). This abandonment may be effected by communicating it "in a manner reasonably calculated to reach co-conspirators." *Borelli, supra*, 336 F.2d at 388. Proof of such communication need not involve evidence that the defendant directly informed each co-conspirator of his intent to withdraw.

> The formation of a criminal conspiracy or adherence to a criminal scheme may be shown by evidence either direct or circumstantial, in practice often taking a wide range, and we see no reason why the withdrawal should not be held susceptible to proof of the same character. It might, of course, be shown by a writing, or by an express oral agreement, and we think by conduct wholly inconsistent with the theory of continuing adherence.

*Buhler v. United States*, 33 F.2d 382, 384 (9th Cir. 1929); *accord, Marino v. United States*, 91 F.2d 691, 698 (9th Cir. 1937), *cert.*

as to each defendant. Each defendant is chargeable with the acts of his or its fellow defendants and alleged co-conspirators only if the acts are done in furtherance of the joint venture as he or it understood it. No defendant is to be held responsible for what some of the alleged conspirators, unknown to the rest, do beyond the reasonable intendment *of the common agreement or understanding, if any, to which you may find him or it a party.* (Emphasis added).

**14.** The trial court's comments were as follows:

I will use them only for the purpose of my own guidance in my final charge, but they are just too late for me to pass on them as a supplemental request for charge, *as for guidance of counsel.  .   .   .* (Emphasis added).

The lateness the court mentions relates not to the submissions in general, but to the court's ability to rule on them *that day* so that counsel would be aware of the court's intent when making their closing arguments.

*denied sub nom. Gullo v. United States,* 302 U.S. 764, 58 S.Ct. 410, 82 L.Ed. 593 (1938). *See also United States v. Goldberg,* 401 F.2d 644, 648–49 (2d Cir. 1968), *cert. denied,* 393 U.S. 1099, 89 S.Ct. 895, 21 L.Ed.2d 790 (separate appeal), *cert. denied sub nom. Tannenbaum v. United States,* 394 U.S. 932, 89 S.Ct. 1202, 22 L.Ed. 461 (1969) (separate appeal); *Developments in the Law—Criminal Conspiracy,* 72 Harv.L.Rev. 920, 958 (1959).

Appellants introduced evidence of the resurgence of price competition, and other forms of competition, which could have convinced the jury that one or more of the defendants had abandoned any conspiracy to stabilize prices and other conditions before the start of the limitations period. They also requested a charge to the effect that active competition on price might amount to the "affirmative action" necessary to accomplish a withdrawal.[15] Trial court's charge, however, negated this theory of withdrawal. The court charged as follows:

In order to find that a defendant abandoned or withdrew from a conspiracy prior to December 27, 1968, you must find from the evidence, that he or it took some affirmative action to disavow or defeat its purpose. Mere inaction would not be enough to demonstrate abandonment. *To withdraw, a defendant either must have affirmatively notified each other member of the conspiracy he will no longer participate in the undertaking so they understand they can no longer expect his participation or acquiescence, or he must*

*make disclosures of the illegal scheme to law enforcement officials.*

Thus, once a defendant is shown to have joined a conspiracy, in order for you to find he abandoned the conspiracy, the evidence must show that the defendant took some definite, decisive step, indicating a complete disassociation from the unlawful enterprise.

(Emphasis added).

As the court explained the meaning of "withdraw," it comprised only affirmative notification—which connotes direct announcement—and disclosure to law enforcement authorities. Either might constitute withdrawal, but the court, by limiting withdrawal to these two, improperly excluded other possibilities, such as conduct inconsistent with the theory of continued adherence.

The court did permit appellants to argue their theory of withdrawal to the jury. That opportunity did not salvage appellants' rights, however, because the court in its subsequent charge told the jury that they could not consider appellants' theory. Reversal is, in my opinion, required on this point.[16]

## IV.

The judgments of conviction will be reversed and the case remanded to the court below.

ADAMS, Circuit Judge, concurring.

While I concur in the reversal of the defendants' convictions, I am impelled to discuss one issue that Judge Hunter has not

---

**15.** The requested charge was as follows:

Even if you find the existence of a conspiracy formed before December 27, 1968 and continuing thereafter you must acquit any defendant if it appears that he withdrew from such a conspiracy prior to the December 27, 1968 date. To withdraw from a conspiracy, a conspirator must take affirmative action. Resumption of competitive behavior, such as intensified price cutting or price wars, *could* constitute such affirmative action. If there is a reasonable doubt as to whether a defendant has withdrawn from the conspiracy charged, if any existed, prior to December 27, 1968, that defendant must be acquitted.

(Emphasis added).

This charge would not have told the jury "that merely the fact that somebody was in competition shows withdrawal from conspiracy," as the trial court feared; instead, it merely recognized appellants' right to have the jury apply their theory of withdrawal if the jury believed their evidence and drew the inferences they asked the jury to draw. While not a model charge on this point, it at least drew the court's attention to the improperly narrow scope of the charge actually given.

**16.** Neither Judge Adams nor Judge Weis agrees with this conclusion.

addressed. That issue is whether the trial judge, in effect, directed the jury to reach definitive verdicts of guilty or not guilty. A determination that the verdicts were so induced would, of course, reinforce the conclusion reached by Judge Hunter.

## I.

After a nineteen week trial, the jury began its deliberations in the afternoon of Tuesday, July 8, 1975. On each of the next two days (Wednesday and Thursday), the jury deliberated from 9:00 a. m. until 10:00 p. m.

On Friday, July 11, the fourth day of sequestered deliberations, the trial court advised counsel that "[s]ome of the jurors aren't feeling well" and that "[s]ome are tired."[1] The judge suggested a weekend cessation in the deliberations to reduce the "strain" on the jury, but defense counsel objected. The district court then summoned the jury foreman who, in the presence of counsel, reported that some jurors were "crying" and that others were concerned about being "away from home for a long time."[2] However, the foreman also stated that the deliberations were "going as well as can be expected."[3] As a result of this report, the trial court decided that deliberations would terminate each day at 6:30 p. m. instead of 10:00 p. m.

On Saturday, July 12, the judge, in open court, ordered the jurors to continue their deliberations. He did so, using a supplemental instruction previously approved by this Court in *United States v. Fioravanti.*[4]

Late on Sunday, the sixth day of deliberations, the jury notified the court that it could not reach a verdict. A note addressed to the judge declared: "We cannot reach a unanimous verdict. If any juror changes his mind now, he would only change due to compassion for his fellow jurors."[5] In response to this note, the judge assembled the jury and, in the presence of counsel, again gave the *Fioravanti* charge. When the jury retired, the judge informed counsel that he would not quickly declare a mistrial after a nineteen week trial.

On Monday, July 14, the seventh day of deliberations, the court received another note from the jury. This message stated that the foreman wished to "discuss the condition of the jury" and to "seek further guidance" from the judge.[6] The trial judge informed counsel that he would confer privately with the foreman, with a court reporter present, and would impound the transcript of the conference. He went on to say, however, that if the parties objected, the foreman's request for a meeting would be denied. When the parties did not object to the proposed conference, though defense counsel did express serious reservations,[7] the judge spoke with the foreman in a room adjacent to the court. The transcript of the discussions then was impounded, despite renewed and repeated requests for it.[8] Indeed, it was not until this Court ordered its

---

1. Transcript at 15,128.

2. *Id.* at 15,135.

3. *Id.* at 15,136.

4. 412 F.2d 407 (3d Cir.), *cert. denied sub nom.*, *Panaccione v. United States*, 396 U.S. 837, 90 S.Ct. 97, 24 L.Ed.2d 88 (1969).

   Basically, the *Fioravanti* charge outlines the responsibilities of each juror during deliberations, including the duties to re-examine one's own predilections and to deliberate with a view towards reaching a verdict, if possible. For the text of the recommended instruction, see 412 F.2d at 420.

   In this Circuit at least, the *Fioravanti* charge supersedes a supplemental instruction approved in *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). In essence, the *Allen* charge cautioned the minority within

a jury to "see the error of its ways." 412 F.2d at 417. Caustically denominated as the "dynamite" charge (*see Green v. United States*, 309 F.2d 852, 853 (5th Cir. 1962)), the *Allen* instruction had been criticized by eminent scholars and jurists as having an inherently coercive influence on jury deliberations. Consequently, this Court suggested the more neutral statement of juror responsibilities embodied in the *Fioravanti* instruction.

5. Docket entry 322, # 24.

6. Transcript at 15,164.

7. *Id.* at 15,165–71.

8. *Id.* at 15,174–75.

disclosure, pursuant to a post-trial motion by defendants, that they learned what the transcript contained.[9]

During the meeting between the judge and the foreman, the foreman initially reported on the health of the jury. He represented that the jurors were "distraught" and "sick," with "at least eight of the jurors . . . taking some kind of pill."[10] The foreman next stated that "personality conflicts on the jury" had impeded their discussions, but that the jurors "have overcome those [conflicts].[11] Finally, the foreman declared that, in his opinion, the jury was deadlocked: "We have taken enough ballots now, and we have had enough discussions, and the way it is divided is not going to be settled by any document, any remembrance of testimony."[12] When the trial judge inquired whether the "jury is hopelessly deadlocked and will never reach a verdict," the foreman responded in the affirmative.[13]

At the end of the conference, the following critical exchange occurred:

Mr. Russell [foreman]: * * * It is a situation I don't know how to help you get what you are after.

The Court: Oh, I am not after anything.

Mr. Russell: *You are after a verdict one way or the other.*

The Court: *Which way it goes doesn't make any difference to me.*[14]

The trial judge then instructed the foreman to "tell [the jury] to keep deliberating and see if they can come to a verdict."[15]

Upon returning to the courtroom, the judge purported to summarize for counsel what had transpired during the conference. The judge first stated that "because of

what [the foreman] calls personality differences between some members of the jury . . . he does not feel that they are ever going to be able to get over this." Thereafter, the court advised counsel that some of the jurors were "not feeling well," but that the foreman really did not "know if they are sick or aren't sick." The judge then announced that he had relayed a message to the jurors "to continue their deliberations."

Significantly, the judge did not tell counsel about the foreman's opinion that the jury was hopelessly deadlocked; did not indicate that the foreman was under the impression that the court wanted a definitive verdict either for the prosecution or the defendants; and did not mention the directive to the jury that it should "see if [it] can come to a verdict." Thus, it does not appear that the report on the substance of the discussions between the court and the foreman was accurate or even substantially accurate.[16]

In any event, on the following morning, the eighth day of deliberations, the jury returned guilty verdicts against each of the defendants.

## II.

Defendants contend that the trial court "coerced" a deadlocked jury into reaching its verdict. They maintain that the judge caused the jurors to deliberate at excessive lengths and despite illness and exhaustion. The defendants also argue that the repetition of even an approved supplemental charge inherently compelled a verdict. Finally, they assert that the district court

---

**9.** Order of the Court of Appeals for the Third Circuit, dated September 16, 1975.

**10.** Conference Transcript at 2.

**11.** *Id.* at 4.

**12.** *Id.* at 4.

**13.** *Id.* at 6.

**14.** *Id.* at 7. (emphasis added)

**15.** *Id.* at 8.

**16.** In his dissenting opinion, Judge Weis appears to emphasize the fact that, after the trial court's report to counsel, one of the defense lawyers "suggested that the appropriate point [for declaration of a mistrial] would be the following morning [Tuesday, July 15]. . ." However, it is reasonable to assume that, had this attorney known of the extent of the jury deadlock or that the court had in no way dispelled the foreman's belief that the court wanted a definitive verdict "one way or the other," he would have demanded an immediate mistrial.

impermissibly insisted upon a verdict, foreclosing the possibility of a hung jury. Since I believe that only the last claim—that the verdict was improperly induced—is valid, I shall confine my discussion to that proposition.

The factual linchpin of the defendants' contention that the court, in effect, "coerced" a verdict from the jury is the private conference between the foreman and the trial judge. There, as noted above, the foreman declared that he knew the court wanted a verdict "one way or the other." At that point, I believe, the trial judge possessed the affirmative obligation to make it clear to the foreman that the jury had the option of reaching no verdict, should juror unanimity prove impossible. Instead, by stating merely "which way it goes doesn't make any difference to me," there was effectively conveyed to the jury, through the medium of the foreman, the directive that only a verdict for the prosecution or a verdict for the defendants would be acceptable to the court. Such an admonition provides justification, in my view, for overturning the defendants' convictions.

Reversal on this ground would appear to be required by prior teachings of the Supreme Court as well as this Court. In a per curiam opinion in *Jenkins v. United States*,[17] the Supreme Court deemed as coercive a trial court's instruction to a jury that "You have got to reach a decision in this case." While the counterpart in the present situation was more subtle in nature, it does not appear to differ materially from the instruction proscribed in *Jenkins*. Nor is it any less coercive.[18]

This Court previously has provided a cogent delineation of the relevant principles governing judge-jury relations during the deliberative period. In *Fioravanti*,[19] we made it clear that a trial judge should not direct jurors to return a verdict, one way or the other, unless they have reached complete unanimity concerning the guilt or innocence of a defendant.

Speaking for a unanimous panel, Judge Aldisert posited:

So long as the unanimous verdict is required in criminal cases, there will always be *three* possible decisions of the jury: (1) not guilty of any charge; (2) guilty of one or more counts of the indictment; and (3) *no verdict* because of a lack of unanimity. The possibility of a hung jury is as much a part of our jury unanimity schema as are verdicts of guilty or not guilty. \* \* \* [I]t is a cardinal principle of the law that a *trial judge may not coerce a jury to the extent of demanding that they return a verdict.*[20]

In our system of criminal justice, then, a jury need not, and may not, render a verdict if it is unable to attain agreement. To permit a trial judge to undermine a jury's prerogative of not returning a verdict would abrogate the protection that the right to a jury accords criminal defendants. Moreover, if jurors are encouraged to subscribe to verdicts to which they are not committed, merely to reach some definitive result upon judicial insistence, then the universal perception of jury verdicts as manifestations of reasoned agreement would have to be examined anew. Such reevaluation is unnecessary so long as we thwart efforts to preclude one bona fide outcome of jury deliberations—no verdict.

None of this is to suggest that jurors should not be encouraged to reach a verdict if unanimity is at all possible, or that the discretion of trial judges over declarations of mistrial should be restricted. Yet where a trial judge, in effect, eliminates the possi-

---

17. 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965).

18. *Jenkins* does differ somewhat from the case at bar, as there the defective charge was given only two hours after the inception of jury deliberations. However, the variance in timing between that case and ours would not appear to be significant. In both situations, the judge made it known to the jurors that he wanted a

definitive verdict, a request that soon after was rewarded. In *Jenkins*, the Supreme Court deemed such a procedure to be reversible error.

19. 412 F.2d 407.

20. 412 F.2d at 416. (emphasis added)

bility of no verdict through comments to the jury, the validity of verdicts rendered by that jury should be called into question.

In the present case, it is evident that the jury had the mistaken impression, for whatever reason, that it must reach a verdict of guilty or not guilty. Yet, that impression was in no way dissipated by the trial court in its conference with the foreman, or at any time thereafter.[21] Indeed, the court's language seems to have confirmed the impression that a verdict of guilty or not guilty was required. This is especially so because the critical dialogue between the trial judge and the foreman occurred immediately after the court learned that the jury was so "hopelessly deadlocked" that the case was "not going to be settled by any document, any remembrance of testimony." In effect, the trial judge at that point took from the jurors their prerogative to render no verdict, should it have appeared to them, as the colloquy with the foreman so indicates, that unanimity was not attainable. Such encroachment on jury authority, and the concomitant proscription of a possible "no verdict" outcome, requires reversal of the defendants' convictions.

In my judgment, the jury issue present here warrants reversal, and such a conclusion buttresses the result reached by Judge Hunter.

### III.

Having decided that the defendants' convictions must be reversed because of the jury question, I will comment but briefly on the matters considered by Judge Hunter.

I concur in Parts I, II and IIIA of Judge Hunter's opinion. As to Part IIIA, I do so, recognizing that the exception to Sherman Act liability that the § 2(b) proviso of the Robinson-Patman Act creates is a very narrow one. Sellers in prosecutions for verification activities face the difficult task of convincing the jury or the court, as the case may be, that such activities do not constitute price-fixing but reflect a "controlling circumstance" beyond their power (e. g., the "lying buyer").[22]

■ With respect to the "conspiracy" and "withdrawal" issues,[23] it is questionable, in my view, whether the charge of the trial judge constituted reversible error. This is particularly so given the length of the trial and the unusually complex legal questions present in this litigation. Within the context of the complete charge and of the trial as a whole, the instructions as to these two issues would appear to be adequate. Even so, as the case must be retried, the district court would do well to incorporate in its charge, on remand, the suggestions set forth by Judge Hunter.

WEIS, Circuit Judge, dissenting.

### A.

The majority opinion discusses the conflict between the Sherman and Robinson-Patman Acts and the resulting dilemma that a business concern may face in steering between this Scylla and Charybdis of commerce. However, the course charted by the majority to avoid these two hazards, while carefully considered, does not clear the shoals of *United States v. Container Corporation of America*, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969).

The trial judge charged the jurors that, standing alone, verification to comply with Robinson-Patman did not violate the Sher-

---

**21.** While the district judge had assured counsel that he would give no instructions on the law during the conference, nor repeat the *Fioravanti* charge, in my view, the judge should have attempted to remedy the foreman's belief that only verdicts of guilty or acquittal were acceptable. If the judge felt constrained not to provide any legal instructions during the conference, because of the assurances afforded counsel, he could have summoned the jury and, in the presence of counsel, informed the jurors that no verdict was appropriate and, indeed, necessary should they be unable to reach unanimity. Here, however, the court failed to take any such steps.

**22.** *United States v. Container Corp. of America*, 393 U.S. 333, 335, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969).

**23.** See Parts IIIB and C of Judge Hunter's opinion.

man Act; such activity, however, could be evidence of an illegal agreement despite a proper purpose if stabilization of prices resulted. The majority hold that this instruction was erroneous. They read *Container Corporation* to allow an exchange of information with competitors in oligopolistic markets where:

1. the motive of the seller is compliance with Robinson-Patman;
2. he doubts the truthfulness of a buyer's report that lower offers by competitors have been made; and
3. the seller is unable to obtain independent corroboration of the buyer's representation.

This combination of factors is characterized as a "controlling circumstance." In the interest of brevity, it may be termed the "lying buyer" defense.

There are serious difficulties with this interpretation when the facts of the *Container* case are examined. The pertinent details in the case are not elaborated in the Supreme Court's opinion but must be gleaned from the extensive findings and opinion of the district court.[1] The trial judge determined that:

1. buyers furnished inaccurate, incomplete or misleading information on prices;
2. no defendant furnished a competitor his most recent price, except in response to a specific request;
3. verification was requested only when buyers were suspected of furnishing inaccurate information;
4. there was no agreement to exchange price data;
5. the information was not disseminated to the public or to customers generally; and
6. there was no proof that the exchange of data had the effect of stabilizing prices.

The district court concluded that the defendant's conduct was designed to "prevent the perpetration of fraud upon them," and thus was insulated by *Cement Manufacturers Protective Association v. United States,* 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104 (1925). Although the district court did not discuss the Robinson-Patman issue, it was briefed by the parties on appeal to the Supreme Court.

The factual background of *Container* is strikingly similar to that of the case *sub judice,* except that these defendants do not deny the existence of an agreement to verify and the jury verdict establishes the fact of effect upon prices. These factors weigh the scales even more heavily on the side of the government. The buyers' behavior in the gypsum industry cannot be classified as a "controlling circumstance" exempting the agreement from the proscription of *Container* if in that case the Court condemned that very circumstance.

The defendants here have been found guilty of price fixing, and it is now well settled that such conduct is illegal even if the motives which inspire it are beneficent or altruistic, *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). In essence, the defendants contend that if price stabilization did occur as a result of their efforts to prepare a Robinson-Patman defense, then such an effect is only incidental and not prohibited. But Robinson-Patman does not mandate price verification with competitors in oligopolistic markets. Our opinion in *Viviano Macaroni Co., v. FTC,* 411 F.2d 255 (3d Cir. 1969), does not go so far but requires only a reasonable inquiry into a buyer's veracity. That case does not compel an investigation which itself is illegal either because it results in price fixing or violates other provisions of law.

If the Robinson-Patman Act requires verification, even that which tends to stabilize prices, it is difficult to understand why the defendants' "purpose" to comply would be significant. Observance of a statutory requirement is legal whether or not the actor has knowledge of it. Thus, it may be seen that the defendants' use of "purpose" is to make it interchangeable with "motive." As *Socony-Vacuum, supra,* makes clear, that

---

**1.** The case is reported at 273 F.Supp. 18 (M.D.N.C.1967).

factor does not absolve those responsible for the forbidden anti-competitive effect. *See Maple Flooring Manufacturers Assn. v. United States,* 268 U.S. 563, 577, 585, 45 S.Ct. 578, 69 L.Ed. 1093 (1925).

I do not understand *Container* to expand the holding of *Cement Manufacturers,* but rather to confine it. The Supreme Court did not attempt to distinguish *Cement* in detail but there is a difference between that fact situation where a seller was bound by an existing contract to furnish material and that which obtains here where he is free to enter into a transaction or not as he chooses. *Container* was based on the premise that information exchanges in a restrictive market have the actual or theoretical effect of stabilizing prices and generally should not be tolerated, 393 U.S. at 337, 89 S.Ct. 510. In the oligopolistic setting, the control of price information by the seller reinforces his economic power in a manner inconsistent with the play of free market forces. This theory led the Supreme Court to reject the proposition that an exception should be made when the exchange of price information in a response to the "lying buyer," though obviously the opinion did not condone the purchaser's tactics.

I agree with the majority that *Belliston v. Texaco, Inc.,* 455 F.2d 175 (10th Cir.), *cert. denied,* 408 U.S. 928, 92 S.Ct. 2494, 33 L.Ed.2d 341 (1972), and *Gray v. Shell Oil Co.,* 469 F.2d 742 (9th Cir. 1972), *cert. denied,* 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1973), do not fit within *Container.*

Moreover, in my view *Wall Products Co. v. National Gypsum Co.,* 326 F.Supp. 295 (N.D. Cal.1971), does not follow the Supreme Court's opinion.

The trial judge in the case *sub judice* obviously grasped the significance of *Container* when he charged:

"[I]f . . . the effect of these exchanges was to raise, fix, maintain, and stabilize the price of gypsum wallboard, then you may consider these [ex]changes as evidence of the mutual agreement . . . to raise, fix . . . and stabilize list prices."

I believe that in the circumstances of this case, the instruction was correct, properly presented the issue to the jury,[2] and, hence, did not constitute reversible error.

### B.

The testimony in this case took more than four months and generated a transcript of many thousand pages. After all the evidence had been received, the trial judge's task was to instruct the jury on complex issues of law in the antitrust, conspiracy and general criminal fields. Such a charge must be phrased in language intelligible to a lay audience and, while conveying the substance of the law, must be sufficiently succinct that the jury is not overwhelmed. Too often we on the appellate courts scrutinize jury instructions for adherence to the esoteric standards expected of a law review article. We tend to forget that the charge should be as simple as possible and contain

**2.** In Handler, Antitrust: 1969, 55 Cornell L. Rev. 161, 176 (1970), Professor Handler writes: "A compact to exchange price information plainly should be unlawful without more if its *purpose or effect* was to stabilize prices." He observed that in *Container Corporation* defendants had stressed Robinson-Patman as well as fraudulent conduct of the buyers as a defense, but Justice Douglas, author of the majority opinion, "rejected these assertions out of hand."

In Kefauver, The Legality of Dissemination of Market Data by Trade Associations: What does *Container* Hold? 57 Cornell L. Rev. 777, 788 (1972), the author states: "The majority in *Container* of course found an *effect* of price stabilization, but nothing in the opinion indi-

cated that they had found a *purpose* on the part of defendants to achieve such an effect." "*Container* placed a new emphasis on the *effect* of competitors' exchange of market information." *Id.* at 791. Professor Handler noted that a contrary result would promote evasion. *Cf.* Eaton, The Robinson-Patman Act: Reconciling the Meeting Competition Defense with the Sherman Act, 18 Antitrust Bull. 411, 427 (1973). ("There is however a great potential for abuse in any 'lying buyer' defense. Its applicability may therefore be somewhat limited.")

A deliberate scheme to fix prices is, of course, illegal, even if unsuccessful, and in such a case the "purpose" of the defendants would be relevant to establish intent.

no more than the jury needs to apply law to facts in reaching a verdict.

■ Judge Hunter's opinion faults the trial judge for failing to give the instruction requested by the defendants which is set out in full at footnote 12. In essence, this point for charge required the jury to determine what kind of agreement or understanding existed as to each defendant. It went on to say that no defendant was to be held responsible for what another conspirator might have done beyond the common agreement or understanding. I assume that the refusal of the trial judge to charge in the precise verbiage requested is not at issue, *see James v. Continental Insurance Co.,* 424 F.2d 1064 (3d Cir. 1970). Rather, the error claimed is the omission of an instruction to the effect that a particular defendant could be found guilty of conspiracy only if he understood that he had joined the single overall agreement charged in the indictment. As I read it, the charge adequately set forth the spirit of the instruction that Judge Hunter desires. The portions of the charge quoted in footnote 11 of his opinion demonstrate that the jury was told each defendant's membership in the conspiracy was to be evaluated on an individual basis.

Early in the charge, the trial judge reviewed the indictment which listed allegations of some thirteen manners and means used to implement the price-fixing conspiracy. He later said:

"Before the jury may find that a defendant or any other person has become a member of a conspiracy, evidence in the case must show, beyond a reasonable doubt, that the conspiracy was knowingly formed and that the defendant or other person who is claimed to have been a member knowingly participated in the unlawful plan, with the intent to advance or further some object or purpose of the conspiracy . . . .. [S]o, if a defendant or any other person, understanding the unlawful character of a plan, intentionally encourages, advises or assists, for the purpose of furthering the undertaking or

scheme, he, therefore, becomes a knowing participant, a conspirator.

\* \* \* \* \* \*

"If it appears beyond a reasonable doubt, from the evidence in the case, that the conspiracy alleged in the indictment was knowingly formed and that any Defendant knowingly became a member of the conspiracy, either at the inception of the plan or scheme or afterward, then the success or failure of the conspiracy to accomplish the common purpose or object is immaterial.

\* \* \* \* \* \*

"In considering whether there was a conspiracy, you should bear in mind that a conspiracy does not have to be completely formed at one place or at one time. It can be put together a little at a time and can be joined at different times or in different ways by each alleged conspirator.

\* \* \* \* \* \*

"Now, there are two essential elements which must be proved in order to establish the offense of conspiracy as charged in this indictment:

"First, that the conspiracy described in the indictment was knowingly formed and was existing at or about the time alleged; and,

"Second, that the Defendants *knowingly* became members of the *conspiracy as charged.*

"If the jury should find—you, the jury, should find, beyond a reasonable doubt, from the evidence in the case, that existence of the conspiracy charged in the indictment has been proved, then the conspiracy offense charged is complete, and it is complete as to every person found by the jury to have been *knowingly* a member of the conspiracy, regardless of whether such a person *knowingly became a member at its inception or the beginning of the conspiracy or afterward, during the continuance of the conspiracy.*

\* \* \* \* \* \*

"You have two questions to determine: First, whether there was a conspiracy of

the character alleged in the indictment; and, second, if so, which of the Defendants, if any or all, were *knowing* participants in it. This involves an examination of the evidence, separately, with respect to each Defendant.

\*　　\*　　\*　　\*　　\*　　\*

"In addition, you would not be warranted in finding any individual Defendant guilty, unless you find beyond a reasonable doubt that, knowing of the existence of the conspiracy, he took some action or authorized or directed the employment of one or more means and methods in furtherance of the conspiracy, as I explained to you earlier." (Emphasis supplied) [3]

The jury was not left in doubt that it was to analyze the evidence of each defendant's participation and return a guilty verdict only if convinced of his participation in the price-fixing scheme charged in the indictment. Moreover, just as a challenged sentence or paragraph should be viewed in the context of the complete charge, so should the instructions be considered in the perspective of the trial as a whole. *Cupp v. Naughten,* 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). After able and vigorous defense counsel had spent many hours arguing their respective clients' innocence and emphasizing the evidentiary matters favorable to them, it is unrealistic to believe that the lack of semantical refinement in a lengthy and otherwise adequate charge had any effect whatsoever on the verdict. In my view, the charge as given was not erroneous but, even assuming it were deficient to some extent, reversal would not be warranted.

### C.

Similarly, I do not agree that the charge on withdrawal from the conspiracy constitutes grounds for reversal. Judge Hunter's view is that the instructions improperly excluded the possibility of proving withdrawal by evidence of conduct inconsistent with adherence. Moreover, Judge Hunter asserts that the trial judge told the jurors they could not consider the defendants' theory to that effect. But the charge clearly and accurately stated that withdrawal could be found from evidence showing a defendant "took some affirmative action to disavow or defeat the purpose of the conspiracy." The court also stated that a defendant must have notified other members of the conspiracy or made disclosure to law enforcement officials. The trial judge concluded this phase of the charge by saying:

"Thus, once a defendant is shown to have joined a conspiracy, in order for you to find he abandoned the conspiracy, the evidence must show that the defendant took some definite, decisive step, indicating a complete disassociation from the unlawful enterprise."

The phrase "some definite, decisive step" was taken from our opinion in *United States v. Chester,* 407 F.2d 53, 55 (3rd Cir.), *cert. denied,* 394 U.S. 1020, 89 S.Ct. 1642, 23 L.Ed.2d 45 (1969), and is a correct statement of the law.

If the defendants understood the charge as limiting the evidence of withdrawal to notification, it was counsel's duty to request a correction. After the charge, defense counsel stated to the court:

"Your Honor in referring to the subject of determination of abandonment of conspiracy named only two precise alternatives and failed to point out that resumption of competitive behavior such as intensified price cutting or price wars could constitute such aggressive action as to terminate conspiracy.

THE COURT: I purposely left that out, as I do not think it is a correct statement of the law."

This colloquy must be understood in light of the discussion which occurred before the charge. Defendants had submitted a request for charge that "resumption of competitive behavior, such as intensified price cutting or price wars, could constitute such

---

[3]. These instructions were taken in large part from 1 E. Devitt and C. Blackmar, Federal Jury Practice and Instructions, Chapter 23, Antitrust-Conspiracy-Contract in Restraint of Trade (2d ed. 1970).

affirmative action. . . ." At a conference held before the summations, the following dialogue took place:

> [DEFENSE COUNSEL]: "Your Honor, may I inquire that you would give the part which says 'Resumption of competitive behavior,' such as intensified price cutting, or   . . .
>
> THE COURT: No, I will not give that. I think that's an improper statement of the law. I am not going to say that.
>
> Competitive behavior may or may not be inconsistent with a conspiracy to fix prices, and it is just as arguable that when prices are low there is a conspiracy to try to get them up and try to get some profits, as there is the other way.
>
> And, furthermore, there is a logical argument here that there are people that were not in the club—as Mr. Fricano put it—not in the conspiracy that caused intensified competition.
>
> So, I am not going to charge that. That's for the jury to determine.
>
> [DEFENSE COUNSEL]: Do I understand that Your Honor is going to charge that there has to be direct evidence of withdrawal?
>
> THE COURT: No, I didn't say that at all.
>
> [DEFENSE COUNSEL]: I mean the point that we are talking about would indicate evidence from which it seems to me the inference would be drawn of withdrawal.
>
> THE COURT: You can argue that to the jury, but I am not going to tell the jury that merely the fact that somebody was in competition shows withdrawal from a conspiracy. I don't think that's good law.
>
> [DEFENSE COUNSEL]: I just want to be sure that you are [sic] going to say there had to be direct evidence of withdrawal.
>
> THE COURT: There are numerous points here that you gentlemen have asked for direct evidence. I am not going to charge that in any instance that there must be direct evidence.

There can always be evidence by conduct from which you can imply something."

Thus, defense counsel were advised in advance that the court would make only a general statement of the law and would not adopt their application of the facts, although counsel would be free to argue their factual proposition to the jury. The defense did not object to the charge because it limited evidence of withdrawal to affirmative notification, but rather because the judge refused to weave in the defense interpretation of the evidence. However, the jurors were free to consider that the alleged competitive activity was a definite, decisive step indicating a complete disassociation from the unlawful enterprise. The verdict indicates they rejected that theory. I cannot justify a new trial on the basis of this asserted deficiency in the charge.

### D.

The concurring opinion finds reversible error in the trial judge's comments to the jury foreman and in the failure to declare a mistrial because the jury was deadlocked. I am unable to agree.

In fairness to the trial judge, it must be emphasized that he spoke to the foreman only after receiving the unequivocal assent of the individual defendants and counsel, and indeed at the latter's urging. Defense counsel voiced some misgivings when the judge advised that he would impound the transcript "for review by some other court if that should ever become necessary," but the judge then stated that he would convey to counsel the import of his conversation with the foreman insofar as it did not reflect the thinking of the jurors. Moreover, the judge was explicit in stating that the transcript would not be available to counsel except on appeal, and he would not meet with the foreman if that provision was unacceptable. This condition precedent could not have been misunderstood by counsel.

After the conference with the foreman ended, the judge met with the lawyers and relayed the substance of the jurors' com-

ments. Defense counsel then moved for a mistrial:

"[O]n the basis that it appears from what we know, from what Your Honor has told us, and our observations, that the jury is deadlocked and it appears unlikely that they would be able to reach a unanimous verdict, apparently even with respect to the individual Defendant parties, and therefore there is the danger of the coerced verdict." [4]

The trial judge did not deny the motion, but deferred ruling, saying: "I am not going to discharge the jury yet . . . . I would like a view as to how much longer I should let them deliberate before I . . declare a mistrial . . . ." One defense lawyer suggested that the appropriate point would be the following morning but another disagreed, stating that the deliberations had gone far enough. The judge responded that he would allow the jury to continue until Friday, and at that time would rule on the motion. Since the verdicts were returned on Tuesday, the following morning, the motion became moot.

On the preceding Friday, July 11, the fourth day of deliberation, the judge advised counsel that some jurors were not feeling well and others were tired. He listed a number of alternatives which might alleviate the jurors' discomfort, including the option of sending them home for the weekend. When the defense objected, the judge acquiesced, although he recalled that this court had approved the practice of allowing jurors in a criminal case to return to their homes during deliberations. *See* *United States v. Piancone*, 506 F.2d 748 (3d Cir. 1974). In an effort to ease the jurors' task, the hours of deliberation were shortened but the sequestration continued.

The concurring opinion contends the jury had the mistaken impression that it was required to reach a verdict of guilty or not guilty. But at no time did the trial judge so charge or otherwise suggest this to the jury. Indeed, he was well aware that such

an instruction would be error. After the *Fioravanti* charge was given on Sunday, the sixth day of deliberation, the judge and counsel had the following conversation:

[DEFENSE COUNSEL]: "That has occurred after Your Honor had on two prior occasions given the charge, first of all in your original charge, then again yesterday afternoon advising them as to their obligation to reach a verdict.

\* \* \* \* \* \*

THE COURT: I would only point out that I did not charge them as to their obligation to reach a verdict.

\* \* \* \* \* \*

I at no time said they had a duty to reach a verdict. I said they had a duty to deliberate toward reaching a verdict. I think that would be error, and I did not do that.

[DEFENSE COUNSEL]: I didn't mean to indicate you used those words. I used that as a short-hand way of referring to the charge Your Honor had given and I believe in all these instances it was similar to the Third Circuit charge . . . ."

In concluding his remarks to the jury foreman on Monday, the judge said:

"You tell them to keep deliberating and *see if they can come to a verdict*." (Emphasis supplied)

I do not read this as a direction to reach a verdict, but rather that the jury should attempt to reach a verdict. This was a perfectly proper admonition. Plainly the judge did not rule out the possibility that the jury could not come to a verdict since the language of his remark was conditional.

In my view it would not have been proper for the judge to have told the foreman at the private conference that the jury had the option of reaching no verdict. The judge had assured counsel in advance that he would give no instruction on the law during the conference and, indeed, the defense

---

4. In view of the tenor of the motion, I see no significance in the fact that the trial judge did not report the foreman's belief that the jury

was deadlocked. Indeed, the defense lawyers had moved for a mistrial on the previous day because of an allegedly hung jury.

lawyers were most anxious that there be no repetition of the *Fioravanti* charge. It is also highly unlikely that thereafter defense counsel would have asked the court to tell the jury about its privilege to return no verdict. For some time before the conference, all the lawyers were aware that the possibility of a true deadlock existed, but no request for additional charge along that line had been made. Moreover, I would doubt that such an instruction should be given. Experience demonstrates that juries should be encouraged to reach verdicts and should not be proffered an "easy way out" by a judicial suggestion that a deadlock is an equally satisfactory alternative. It is the duty of the trial judge to determine when the jury has "hung," and then declare a mistrial. This procedure adequately protects the right of the parties to a "no verdict" trial.[5]

The reasoning of *Jenkins v. United States*, 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965), is not pertinent here. In that case, after only two hours of deliberation, the trial judge stated to the jury in part, "You have got to reach a decision in this case." *Id.* at 446, 85 S.Ct. at 1060. The Solicitor General's brief referred to the principle that jurors may not be coerced into surrendering views conscientiously held. *Fioravanti* also refers to that principle, and the trial judge here cautioned the jury in that vein on several occasions. *United States v. Fioravanti*, 412 F.2d 407 (3d Cir.), cert. denied, 396 U.S. 837, 90 S.Ct. 97, 24 L.Ed.2d 88 (1969). The record does not support the assertion that he impermissibly insisted on a verdict.

The decision to declare a mistrial must in large measure be entrusted to the discretion of the trial judge. He is "on the scene" and is in a position to make an informed judgment on the physical and emotional conditions of the jurors, the difficulties involved in the issues submitted to them, and the likelihood that a verdict will be reached. No record can convey all the imponderable factors to an appellate court, nor does its experience better qualify it in any but the exceptional case to second-guess the trial judge. The fact that the foreman thought no verdict could be reached is not conclusive upon us or the trial judge. It is not uncommon that a verdict is returned after a jury has sincerely thought it was deadlocked. The foreman was not endowed with the experience of the trial judge, and it is understandable that with so many complex issues to be resolved, he became discouraged during the deliberations.[6]

This was a lengthy and vigorously contested case, where the factual issues were close and the mass of exhibits formidable. It would seem inconceivable that any reasoned, responsible verdict could have been reached without extended deliberations. Moreover, the expenditure of time, resources and effort on the part of all concerned obligated the trial judge to exert his best efforts to secure a verdict if one could be reached without injustice or coercion. I am convinced that he properly exercised his discretion. The defendants' contention to the contrary rings somewhat hollow in my ears, particularly in view of their objection to permitting the jurors to return home during the deliberations, at least over the weekend.[7]

---

**5.** The problem engendered by a charge to the jury advising of its right to return "no verdict" is similar to that in which a criminal jury would be told that it may disregard the charge and acquit the defendant in spite of the law. While a jury does have such a right, the wisdom of such an instruction has been vigorously debated. *See* the opinion of Judge Sobeloff in *United States v. Moylan*, 417 F.2d 1002 (4th Cir. 1969), *cert. denied*, 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91 (1970). *Cf. United States v. Alper*, 449 F.2d 1223, 1233 (3d Cir. 1971), *cert. denied*, 405 U.S. 988, 92 S.Ct. 1248, 31 L.Ed.2d 453 (1972).

**6.** After the jury returned its verdicts, it was polled several times and each juror unequivocally confirmed the findings of guilt.

**7.** It is difficult to understand the defense' reluctance about allowing the jurors to return home since they had done so each evening during the months when testimony was being received. If there had been danger of damaging publicity or improper approaches to the jury, it would not have sprung into existence simply because deliberations had begun.

It has often been said that there are no perfect trials, and the best that our system can provide is a fair one. I believe that criterion was met here and, accordingly, I would affirm.